T.C. Memo. 2012-327

UNITED STATES TAX COURT

G.D. PARKER, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  20280-06L, 29268-09,       Filed November 27, 2012.
5020-10,     5044-10.

David M. Garvin, for petitioner.

Sergio Garcia-Pages and Timothy A. Sloane, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  In these consolidated cases,[1] respondent issued a notice of
determination and three notices of deficiency.  After concessions[2] the issues for

_____

[1]These cases were consolidated for purposes of trial, briefing, and opinion.

[2]Respondent concedes that petitioner established that Vilanova, S.A., had a
(continued...)

[*2] decision are: (1) whether G.D. Parker, Inc. (petitioner), is entitled to deduct a capital loss of $12,624,219 from the sale of stock in 2004; and, as a result, whether petitioner is entitled to a capital loss carryback of $3,089,131 for 2003 and a capital loss carryover of $7,722,827 for 2005; (2) whether respondent's Appeals Office properly sustained respondent's filing of a notice of Federal tax lien with respect to petitioner's self-assessed income tax liability for 2003; (3) whether petitioner failed to report $1 million of income from the sale of partnership interests in 2003, and alternatively, if the receipt of $1 million in 2003 is determined to be a loan, whether petitioner failed to include $1 million of cancellation of indebtedness income for 2004; (4) whether petitioner is entitled to deductions for depreciation of $104,650, $85,610, and $84,089 for 2003, 2004, and 2005, respectively; (5) whether petitioner is entitled to various deductions for

---

[2](...continued)
basis of $12,746,730 in the BellSouth Peru, S.A. stock immediately before petitioner allegedly acquired the stock from Vilanova, S.A., on December 21, 2004. Respondent also concedes that petitioner reported its receipt of $7 million from the sale of partnership interests in Miami Beach Marina Associates, Ltd., and Conch Harbor Marina Associates, Ltd., including the $1 million it received during 2003, on its Federal income tax return for the taxable year 2004. Respondent concedes that the amount of petitioner's withholding tax liability for constructive dividends in 2003 is $80,100, not $87,300. Finally, respondent concedes that petitioner is not liable for the additions to tax under secs. 6651(a)(1) and (2) and 6656 relating to unreported dividends.

[*3] repair and maintenance expenses of $123,242, $50,000, and $9,623 for 2003, 2004, and 2005, respectively; (6) whether petitioner is entitled to miscellaneous other deductions of $1,106,497, $468,938, and $304,718 for 2003, 2004, and 2005, respectively; (7) whether petitioner is liable for withholding tax under sections 1442[3] and 1461 of $80,100, $90,000, and $90,000 for 2003, 2004, and 2005, respectively; and (8) whether petitioner is liable for accuracy-related penalties under section 6662 for 2003, 2004, and 2005.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Those exhibits attached to the stipulations which were found relevant and admissible are incorporated herein by this reference. At the time the petitions were filed, petitioner was a Florida corporation with its principal place of business in Key Biscayne, Florida.

1.    G.D. Parker, Inc., & Subsidiaries

Genaro Delgado Parker is a citizen and resident of the Republic of Peru. On February 5, 1997, Mr. Parker incorporated petitioner under the laws of the State of

---

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Amounts are rounded to the nearest dollar.

**[*4]** Florida. Vilanova, S.A. (Vilanova), a corporation organized under the laws of the Republic of Panama, held all of the stock of petitioner. During the years at issue petitioner filed consolidated Federal income tax returns as the common parent of an affiliated group (GD Parker affiliated group). The members of the affiliated group included M. Vanini Investments, Inc. (Vanini), G. D. P. Investments, Inc. (GDP), and Stella-Mar, Inc. (Stella-Mar).

A. Vanini

Vanini was a corporation organized under the laws of the State of Florida on May 28, 1996. Petitioner owned all of the stock of Vanini during the years at issue. Vanini owned a home in Key Biscayne, Florida (Key Biscayne home), during the years at issue and in January 2000 purchased a home in Valdemossa, Spain (Valdemossa home).

i. Key Biscayne Home

The Key Biscayne home was a single-family home in Key Biscayne, Florida. The home was a 23-room, luxury three-story house which included a living room, a kitchen, a dining room, a dining area, a utility room, a den, a family room, a patio with a balcony, seven bedrooms, and 7-1/2 bathrooms. It sat on 14,250 square feet of land and included 10,105 square feet of living area abutting a double wide canal with access to Biscayne Bay and the Atlantic Ocean. The

[*5] ground floor of the home contained a four-car garage, a swimming pool, a built-in spa, and an office.

During 2003, 2004, and 2005 Mr. Parker and his family were given rent-free use of the Key Biscayne home. Lesli M. Loayza, Mr. Parker's daughter, resided at the home throughout 2003, 2004, and 2005 while she attended Florida International University. Jonathan S. Loayza, Mr. Parker's son, resided at the home for least six months during 2003 and five months during 2005. In 2003 Mr. Loayza attended St. Agnes Academy in Key Biscayne, and in 2005 he attended Gulliver Academy in Coral Gables, Florida. Estrella Delgado Parker Vanini, Mr. Parker's daughter, resided at the home for six months during 2003. She also attended St. Agnes Academy in 2003. Marcella Vanini, Mr. Parker's wife, resided at the home whenever she visited Miami, including at least five visits to Miami in April, July, and August 2004, and February and September 2005. Mr. Parker resided at the home whenever he visited Miami, including at least 11 visits to Miami in May, June, September, October, and December 2003; in January, February, June, and September 2004; and in February and September 2005. Mr. Parker reserved a bedroom at the home exclusively for his use. Blanca A. Gonzalez, the Parker family's personal maid, also lived at the Key Biscayne home during 2003, 2004, and 2005.

**[\*6]**   Ms. Bruce, the administrative assistant for the GD Parker affiliated group, worked out of the Key Biscayne home.  She used the office on the ground floor five days a week.  The office contained the records and files for the four companies making up the GD Parker affiliated group.  Ms. Bruce had exclusive use of the ground floor office as none of Mr. Parker's family members used the office space.

ii.    Valdemossa Home

The Valdemossa home was a two-story building on 31,090 square meters of land on top of a mountain on the island of Mallorca, Spain, overlooking the Mediterranean Sea.  Mr. Parker used the Valdemossa home during 2003, 2004, and 2005 as a vacation home for approximately one month per year.  Mr. Parker used the yacht, the Stella Mar (described infra), while he was on vacation at the Valdemossa home.  Petitioner did not rent, or offer to rent, the Valdemossa home to third parties during 2003, 2004, and 2005.

B.    Stella-Mar

Stella-Mar was a corporation organized under the laws of the State of Florida on February 6, 1997.  Petitioner owned all the stock of Stella-Mar.  Stella-Mar purchased a 78-foot Azimut yacht called the Stella Mar (yacht).

**[*7]**   C.   <u>GDP</u>

GDP was a corporation organized under the laws of the State of Florida on May 21, 1996.  Petitioner owned 80% of the stock of GDP.  In turn GDP held an approximately 49% limited partnership interest in Conch Harbor and a 50% limited partnership interest in Miami Beach Marina Associates.  Conch Harbor owned the Conch Harbor Marina in Key West, Florida.  Miami Beach Marina Associates owned the Miami Beach Marina in Miami Beach, Florida.

The following chart shows the holdings of the various entities.

[*8]



On December 5, 2003, GDP sold all of its partnership interest in Miami

Beach Marina Associates and Conch Harbor (partnership interests) to Robert

Christoph for $7 million.  Mr. Parker negotiated the price and other terms of the

sale on behalf of GDP.  The parties entered into an installment sale in which Mr.

[*9] Christoph paid $1 million to GDP in 2003 and $6 million to GDP in 2004.

Petitioner filed Forms 6252, Installment Sale Income, with both its 2003 and 2004

Federal income tax returns. The installment sale resulted in petitioner's reporting

capital gains of $3,089,131 for 2003 and $7,722,827 for 2004.[4] Petitioner treated

the $1 million GDP received from Mr. Christoph in 2003 as an advance on the $7

million GDP was supposed to receive in sale proceeds in 2004. Consequently, his

accountants treated the $1 million as a loan and not income for 2003. Petitioner

reported the $1 million received in 2003 and the $6 million received in 2004 as $7

million of capital gain income on its 2004 consolidated Federal income tax return.

Morrison, Brown, Argiz & Farra, LLP (MBAF), prepared the GD Parker

affiliated group's U.S. Federal income tax returns. MBAF also provided tax

planning advice to Mr. Parker and the GD Parker affiliated group. Miguel G.

Farra is a partner at MBAF, a certified public accountant, and an attorney. On

September 1, 2004, Mr. Farra met with Mr. Parker to discuss the GD Parker

affiliated group's 2003 and 2004 Federal income tax returns. Mr. Farra informed

Mr. Parker that the GD Parker affiliated group would owe Federal income tax on

---

[4]The difference between the capital gains reported on petitioner's 2003 and 2004 Federal income tax returns and the cash received is due to petitioner's claiming deductions for partnership losses which should have been carried forward or otherwise limited.

[*10] approximately $7 million of gain for 2004 from the sale of the partnership interests. Mr. Parker indicated to Mr. Farra that it was an inopportune time to have to pay so much tax. The two men discussed ways to avoid paying tax on the gain for 2004.

On September 17, 2004, Mr. Farra and Lief Novie, a certified public accountant and an attorney working for MBAF in 2004, wrote a memorandum to Mr. Parker in which MBAF determined that the best way to offset the $7 million of capital gains for 2004 was to have Vilanova, petitioner's parent corporation, contribute to petitioner in a section 351 transaction shares of stock with a built-in loss.[5] MBAF included a warning that the IRS could disallow the loss deduction to petitioner if Vilanova's transfer of the built-in loss asset did not have a legitimate business purpose. The memorandum further warned that there was a proposal in Congress to limit the transfer of built-in loss assets and that petitioner might not be entitled to claim a tax loss from the disposition of the built-in loss asset if the legislative proposal was implemented with an effective date prior to the date of petitioner's acquisition of the built-in loss asset. On September 30, 2004, Mr. Farra prepared a Spanish translation of the September 17, 2004, memorandum.

---

[5]Discussed infra.

[*11] On October 22, 2004, Congress passed the American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 836(a), 118 Stat. at 1418, which added section 362(e) limiting the importation of built-in losses. Section 362(e) is effective for transactions occurring after October 22, 2004.

2. Mr. Parker's Foreign Corporations

A. Tele2000

Mr. Parker also controlled a group of foreign corporations. This group included Vilanova, petitioner's parent corporation. Mr. Parker organized these foreign corporations before organizing petitioner and the GD Parker affiliated group.

In 1990 Mr. Parker organized Telemovil, S.A. (Telemovil), a Peruvian telecommunications company. Mr. Parker also organized a Panamanian corporation, Vicmar, S.A. (Vicmar). Mr. Parker held all the shares of Vicmar. Mr. Parker and Vicmar together owned approximately 73% of the outstanding shares of Telemovil with the general public owning the remaining outstanding shares of stock. On April 11, 1993, Telemovil changed its name to Tele2000, S.A. (Tele2000).[6] Tele2000 was a publicly traded company listed on the Lima Stock

---

[6]In 1999 Tele2000 changed its name to BellSouth Peru, N.A. (BellSouth Peru). During November 2004 BellSouth Peru changed its name to Comunicaciones
(continued...)

[*12] Exchange in Lima, Peru, that provided cellular telephone and paging services in Peru.  As of July 16, 1996, Mr. Parker owned approximately 33% of Tele2000 and Vicmar owned approximately 39% of Tele2000.  Vicmar also owned all of the stock of Vilanova.

The following chart shows the holdings of the various entities.



---

<sup>6</sup>(...continued)
Moviles del Peru, S.A. (Comunicaciones Moviles).  On June 1, 2005, Comunicaciones Moviles changed its name to Telefonica Moviles, S.A. (Telefonica Moviles Peru).  Unless otherwise indicated, for purposes of this opinion we refer to Telemovil, Tele2000, BellSouth Peru, Communicaciones Moviles, and Telefonica Moviles Peru as "Tele2000 ".

[*13] B.     Sale of Tele2000 Shares to BellSouth

BellSouth Corp. (BellSouth) is a corporation organized under the laws of the State of Georgia.  In 1996 BellSouth entered into negotiations with Mr. Parker and Vicmar as part of an effort to acquire a majority interest in Tele2000.  BellSouth created BellSouth Peru BVI, Ltd. (BellSouth Peru BVI), a corporation organized under the laws of the British Virgin Islands, to hold the shares of stock it purchased in Tele2000.  On December 5, 1996, Mr. Parker, Vicmar, BellSouth Peru BVI, and Tele2000 entered into a stock purchase agreement under which Mr. Parker and Vicmar sold 37.28% of the outstanding shares in Tele2000 to BellSouth Peru BVI for $71,280,000.  As of January 7, 1997, BellSouth Peru BVI had acquired from all shareholders, including the public, approximately a 60% majority shareholder interest in Tele2000 while Mr. Parker and Vicmar retained approximately a 40% minority interest.

BellSouth Peru BVI made substantial changes to Tele2000's management structure and its accounting methods.  Tele2000 began losing money, which required it to make a capital call of $50 million in 1997 and another $50 million in 1998.  In order to maintain its and Mr. Parker's approximately 40% minority position in Tele2000, Vicmar purchased 13,333,333 additional shares for $1.50 per share in 1997 and 20 million shares for $1 per share in 1998.

[*14] On March 26, 1999, Mr. Parker, Vicmar, Vilanova, and BellSouth Peru BVI entered into a second stock purchase agreement (second stock purchase agreement) under which BellSouth Peru BVI agreed to purchase all but approximately 2% of Mr. Parker's, Vicmar's, and Vilanova's remaining shares of stock in Tele2000. Mr. Parker, Vicmar, and Vilanova received 50 cents a share in cash and the shares of TeleCable, S.A. (TeleCable), a wholly owned subsidiary of Tele2000. TeleCable is a corporation organized under the laws of the Republic of Peru that provided television cable services in Peru. BellSouth had no interest in the cable business. After the close of the second stock purchase agreement, Mr. Parker, Vicmar and Vilanova were left with 14,643,477 shares of Tele2000 stock and all of the stock of TeleCable, now held as a wholly owned subsidiary of Vicmar.

As of July 18, 2001, BellSouth Peru BVI owned 97.4267% of the total shares of stock in Tele2000. Vicmar held 12,746,730 shares of stock in Tele2000, representing 2.09151% of the total shares of stock in Tele2000 (Tele2000 shares). The Tele2000 shares were valued at $1 per share giving Vicmar a basis of $12,746,730[7] in the shares.

---

[7]The parties stipulated the basis attributable to the remaining Tele2000 shares.

**[*15]** The following chart shows the holdings of the various entities as of July 18, 2001.



**[*16]** On November 29, 2002, Vicmar transferred ownership of the Tele2000 shares

to Vilanova.  The following chart shows the holdings of the various entities as of

November 29, 2002.



[*17] In 1999 the Superintendencia Nacional De Administracion Tributaria (SUNAT)[8] began an audit of Tele2000. SUNAT determined that Tele2000 had an unpaid Peruvian tax liability of 165,320,885 Peruvian soles (approximately $50 million) for 1994 through 1996, years in which Mr. Parker and Vicmar controlled the company. In September 2000 Tele2000 settled its Peruvian tax liability through an amnesty program agreeing to pay SUNAT 34,585,372 Peruvian soles (approximately $10 million).

BellSouth Peru BVI and Tele2000 sought indemnification from Mr. Parker and Vicmar for the approximately $10 million paid to SUNAT. They argued that the tax liability was incurred during Mr. Parker and Vicmar's management of Tele2000. Mr. Parker and Vicmar argued that BellSouth Peru BVI was solely responsible for the tax liability because BellSouth Peru BVI had lost Tele2000's 1994, 1995 and 1996 tax records which substantiated the tax positions taken for those years.

During 2001 and 2002 Tele2000, BellSouth Peru BVI, Mr. Parker, and Vicmar engaged in settlement negotiations to resolve their various disputes, including the dispute over the approximately $10 million payment to SUNAT. In

---

[8]SUNAT is an agency of the Peruvian Government responsible for enforcing the Peruvian tax laws, similar to the Internal Revenue Service (IRS).

[*18] September 2001 Mr. Parker and Vicmar proposed contributing $5 million towards Tele2000's $10 million settlement with SUNAT in exchange for BellSouth Peru BVI's purchasing all of Mr. Parker's and Vicmar's stock in Tele2000, including the Tele2000 shares, for $2 a share ($29,286,954 for 14,643,477 shares). BellSouth Peru BVI rejected Mr. Parker and Vicmar's settlement proposal.

In 2002 BellSouth and BellSouth Peru BVI began negotiating with Telefonica Moviles, S.A. (Telefonica), a Spanish media conglomerate, to sell Telefonica its Latin American operations, including Tele2000. Telefonica wanted to acquire 100% of Tele2000, not just BellSouth Peru BVI's interest. Thus, BellSouth Peru BVI resumed negotiations with Mr. Parker and Vicmar. On April 4, 2002, Mr. Parker and Vicmar again offered to sell their shares in Tele2000, including the Tele2000 shares, to BellSouth Peru BVI, this time for 35 cents per share and BellSouth Peru BVI's agreement to drop its claim with regard to the $10 million paid to SUNAT. BellSouth Peru BVI rejected the offer, instead choosing to handle the matter through arbitration.

On August 1, 2003, BellSouth Peru BVI and Tele2000 filed for arbitration against Mr. Parker and Vicmar seeking $10 million in damages (arbitration) not knowing that the Tele2000 shares had been transferred from Vicmar to Vilanova

[*19] on November 29, 2002. The arbitration took place in September 2004 in New York City and was titled "BellSouth Peru BVI Limited and BellSouth Peru, S.A. v. Corporacion Vicmar, S.A. and Genaro Delgado Parker". The arbitration panel consisted of three attorneys from the law firm Hughes, Hubbard & Reed, LLP. Petitioner, though not a party to the arbitration, paid the expenses associated with the arbitration including Vicmar's (Vilanova's) attorney's fees.

Mr. Parker in turn sought legal advice about initiating a shareholder derivative suit against BellSouth Peru BVI and Tele2000 in Lima, Peru. Mr. Parker argued that BellSouth Peru BVI's poor management of Tele2000 had caused the minority shareholders (i.e., Mr. Parker and Vilanova) to sustain a substantial economic loss. Mr. Parker's attorney, James Vidalon Orellana, recommended that Vilanova transfer the Tele2000 shares to a U.S. company because Panamanian companies were viewed less favorably by the Peruvian courts. Mr. Orellana recommended that they proceed by filing a complaint in Vilanova's name and later amend the complaint to reflect new ownership of the shares.

On December 10, 2004, Vilanova initiated a shareholder derivative suit against Tele2000 and BellSouth Peru BVI in the 17th Civil Specialized Court of Lima, Peru (shareholder derivative suit).

**[\*20]** C.    <u>Transfer of Tele2000 Shares to Petitioner</u>

On August 30, 2004, Pedro Mujica Benavides, Vilanova's Peruvian attorney, wrote a letter to petitioner on behalf of Vilanova proposing to make a capital contribution to petitioner of the Tele2000 shares. The shares were valued at $1 per share for a capital contribution of $12,746,730. On September 2, 2004, at a special meeting of the board of directors of petitioner, Mr. Parker, as the sole director of petitioner, accepted Vilanova's contribution. That same day, Mr. Parker, as president of petitioner, responded to the August 30, 2004, letter accepting Vilanova's capital contribution. Vilanova confirmed receipt of petitioner's September 2, 2004, acceptance and informed petitioner that it was sending a letter of instructions to Sociedad Agente de Bolsa LatinoAmericana, S.A. (LatinoAmericana),[9] as transferor, requesting that it formalize the transfer. On September 20, 2004, Mr. Parker as a representative of petitioner, wrote a letter to LatinoAmericana directing LatinoAmericana to transfer the Tele2000 shares to petitioner in an over-the-counter transaction. That same day, Federico Castro Ramirez, as a representative of Vilanova, also wrote a letter to LatinoAmericana

---

[9]LatinoAmericana, a corporation organized under the laws of the Republic of Peru, is a brokerage firm licensed to trade securities listed on the Lima Stock Exchange.

[*21] directing it to transfer the Tele2000 shares to petitioner in an over-the-counter transaction.

The physical stock certificate for the Tele2000 shares (Tele2000 stock certificate) was being held in Vilanova's account with Lehman Brothers, Inc. (Lehman), in Miami, Florida. Felix Perez, a senior vice president in the financial services division of Lehman's Miami office handled Vilanova's account. On September 17, 2004, Mr. Quesada, Vilanova's attorney, faxed a letter to Lehman dated September 15, 2004, requesting Lehman to transfer the Tele2000 shares into a Lehman account established for petitioner.

Mr. Perez, though the account manager, was not authorized to make the transfer. Lehman maintained a back office that was responsible for executing all transfers of securities. Mr. Perez requested the back office to take the necessary steps to transfer the stock to petitioner. Lehman's back office at first was unsure how to transfer the Tele2000 shares. Eventually, it determined that the stock was a local security which needed to be transferred in accordance with Peruvian law. Lehman determined that Vilanova had to transfer the stock through the Lima Stock Exchange.

On November 17, 2004, Mr. Parker sent a letter to Lehman on behalf of Vilanova. Mr. Parker requested that Lehman complete the transfer of the

[*22] Tele2000 shares from Vilanova's account to petitioner's account and notify the Lima Stock Exchange of the transfer. Lehman received the letter, and an employee of Lehman made a handwritten note on the letter to make journal entries moving the Tele2000 shares from Vilanova's account to petitioner's account. Petitioner opened an account with Lehman sometime in November 2004. Lehman issued an account statement to petitioner for the month of December 2004.[10] The December 2004 statement was the first account statement that Lehman issued for petitioner's account. The December statement contained a December 1, 2004, journal entry transferring the Tele2000 shares into petitioner's account. The statement also contained a second journal entry on December 2, 2004, canceling the December 1, 2004, journal entry. As a result, the Tele2000 shares never entered petitioner's account.

On December 17, 2004, Lehman received a signed letter from Mr. Parker on behalf of Vilanova. Mr. Parker requested that Lehman mail the Tele2000 stock certificate to Lima, Peru. That same day, Lehman mailed the Tele2000 stock certificate to Lima in accordance with Vilanova's instructions.

---

[10]The exact date petitioner opened its account with Lehman is unknown. The first financial statement available for petitioner's account with Lehman is the December 2004 statement. Mr. Perez testified that the first statement for an account becomes available in the month following the month in which the account is opened.

[*23] On December 21, 2004, LatinoAmericana received delivery of the Tele2000 stock certificate from Lehman.  The fair market value of the Tele2000 shares on December 21, 2004, was $195,418 (12,746,730 shares valued at approximately 1.5 cents per share).  On December 21, 2004, petitioner sent a letter to LatinoAmericana confirming petitioner's September 20, 2004, order requesting the transfer of the Tele2000 shares to petitioner.  LatinoAmericana took a number of steps on December 21, 2004, to transfer the Tele2000 shares to petitioner:  (1) LatinoAmericana executed the transfer in an over-the-counter transaction and issued two transfer documents, one reflecting Vilanova's transfer of the Tele2000 shares and the other reflecting petitioner's receipt of the Tele2000 shares; (2) LatinoAmericana informed Tele2000 of the transfer; (3) Tele2000 canceled the Tele2000 stock certificate and issued a new certificate reflecting petitioner's ownership of the Tele2000 shares; (4) Tele2000 registered the transfer in its stock ledger; and (5) LatinoAmericana notified the Lima Stock Exchange of the transfer and the Lima Stock Exchange reported the transfer in the Lima Stock Exchange Daily Gazette.

     D.    <u>Sale of Tele2000 to Telefonica</u>

In March 2004 BellSouth entered into an agreement with Telefonica to sell its Latin American operations, including its stock in Tele2000 for $5.8 billion.

[*24] Telefonica agreed to pay approximately 1.5 cents per share for Tele2000, and BellSouth agreed to indemnify Telefonica for any ongoing litigation with Tele2000's minority shareholders and to ensure that Telefonica would not have to pay more per share to the minority shareholders than it paid to BellSouth Peru BVI for its shares. BellSouth contacted Mr. Parker and informed him of the sale and Telefonica's offer to purchase the Tele2000 shares for approximately 1.5 cents per share. The sale of Bellsouth's Latin American operations to Telefonica was finalized on October 28, 2004.

On December 16, 2004, BellSouth, Tele2000, Telefonica, Mr. Parker, Vicmar, Vilanova, and petitioner entered into a share transfer and settlement agreement (share transfer agreement). Petitioner was made a party to the share transfer agreement at the last minute after Mr. Parker represented to the other parties that petitioner was the owner of the Tele2000 shares. Before Mr. Parker's last-minute representation, BellSouth's attorney, Arthur Hillman, was unaware of petitioner's existence. Petitioner agreed to sell the Tele2000 shares to Telefonica for $195,418 (approximately 1.5 cents per share), and BellSouth Peru BVI and Tele2000 agreed to seek dismissal of the arbitration. Vilanova also agreed to seek dismissal of its shareholder derivative suit. On December 16, 2004, Vilanova filed

**[*25]** a motion in the 17th Civil Specialized Court of Lima, Peru, to dismiss its shareholder derivative suit.

The sale was finalized on December 23, 2004.  Telefonica paid $122,570 for the shares ($195,418 less brokerage commissions, CONASEV fees, and sales tax).  Telefonica made payment to Mr. Parker, not petitioner.  Petitioner reported the sale of the Tele2000 shares on its 2004 Federal income tax return.  Petitioner reported a sale price of $122,570 and a basis in the Tele2000 shares of $12,746,730 resulting in a capital loss of $12,624,219.  Although respondent concedes the sale price of the Tele2000 shares, he challenges petitioner's basis in the Tele2000 shares and the deductibility of the capital loss on the various grounds  discussed infra.

On December 28, 2004, BellSouth Peru BVI, Tele2000, Mr. Parker, and Vicmar filed a stipulation of dismissal with the arbitration panel stating that the parties had settled all claims raised in the arbitration.  As a result, on January 7, 2005, the arbitration panel dismissed the claims without ruling on the merits of the case.

**[\*26]** 3.  Notice of Determination and Notices of Deficiency

  A.  Notice of Determination (Docket No. 20280-06L)

Petitioner filed a delinquent consolidated Federal income tax return for 2003 on January 4, 2005.  Petitioner reported, but did not pay, a tax liability of $636,279.  Petitioner also failed to make estimated payments of tax for 2003.  On June 7, 2005, respondent filed a notice of Federal tax lien in Dade County, Florida, with respect to petitioner's self-assessed tax liability for 2003.  On or about June 14, 2005, respondent mailed petitioner Letter 3172, Notice of Federal Tax Lien Filing & Your Right to a Hearing Under IRC § 6320 (notice of Federal tax lien).  Petitioner timely filed Form 12153, Request for a Collection Due Process or Equivalent Hearing.  On July 14, 2006, respondent's Appeals Office held a telephone conference with petitioner's representative, Rosa Bravo.  During the due process hearing, petitioner argued that it had sustained a capital loss on its 2004 Federal income tax return and had filed an amended Federal consolidated income tax return for 2003 claiming a capital loss carryback which reduced its 2003 tax liability to zero.  Petitioner timely filed its 2004 Federal consolidated income tax return on March 15, 2005, along with an amended Federal consolidated income tax return for 2003.  Respondent did not process petitioner's 2004 return until May 9, 2005.  As a result, petitioner's 2003 amended Federal

[*27] income tax return could not be processed when filed as the 2004 carryback was not available. On September 12, 2006, respondent's Appeals Office issued a notice of determination sustaining the filing of the notice of Federal tax lien. On October 5, 2006, petitioner filed the petition in docket No. 20280-06L.

B. Notice of Deficiency (Docket No. 29268-09)

On September 16, 2009, respondent issued to petitioner a notice of deficiency for 2005 which determined a Federal income tax deficiency of $839,462 and an accuracy-related penalty of $335,785 under section 6662 based upon petitioner's failure to substantiate its claimed basis in the Tele2000 shares. Accordingly, the capital loss carryover of $2,660,117 claimed for 2005 was disallowed. Respondent, alternatively, determined that the transaction in which petitioner acquired the Tele2000 shares constituted an importation of a net built-in loss under section 362(e). Therefore, under respondent's determination petitioner's basis in the Tele2000 shares was equal to the fair market value of the shares immediately after acquisition, eliminating the claimed capital loss carryover. Respondent also determined that the capital loss carryover was disallowed under section 482 and the doctrine of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), and because the transfer of the Tele2000 shares served no business purpose. Finally, respondent determined that petitioner failed to

[*28] substantiate various trade and business expenses under section 162.  On

December 9, 2009, petitioner timely filed the petition in docket No. 29268-09.

C.      Notice of Deficiency (Docket No. 5044-10)

On December 10, 2009, respondent issued petitioner a notice of deficiency

which determined Federal income tax deficiencies of $793,692 and $2,888,443 for

2003 and 2004, respectively.  Respondent also determined that petitioner was

liable for accuracy-related penalties of $158,738 and $1,102,840 for 2003 and

2004, respectively.  Respondent determined that petitioner had failed to report $1

million of income during 2003 from the sale of its partnership interests.

Respondent alternatively argued that if the $1 million is determined to be a loan,

petitioner failed to report income from the discharge of indebtedness in 2004.

Respondent also determined that petitioner had failed to substantiate its claimed

basis in the Tele2000 shares.  Thus, respondent disallowed the capital loss in 2004

and the capital loss carryback claimed for 2003.  Respondent, alternatively,

determined that the capital loss claimed for 2004 and resulting capital loss

carryback claimed for 2003 were disallowed under sections 362(e) and 482 and

under the step transaction doctrine.  Finally, respondent determined that petitioner

 failed to substantiate various trade and business expenses under section 162.  On

February 26, 2010, petitioner timely filed the petition in docket No. 5044-10

[*29] D.    Notice of Deficiency (Docket No. 5020-10)

On January 26, 2010, respondent issued petitioner a notice of deficiency which determined Federal income tax deficiencies of $87,300, $90,000, and $90,000 for 2003, 2004, and 2005, respectively.  Respondent also determined that petitioner was liable for the following additions to tax:  $19,643, $20,250, and $20,250 for 2003, 2004, and 2005, respectively, for failure to file withholding tax returns under section 6651(a)(1); $21,825, $22,500, and $21,150 for 2003, 2004, and 2005, respectively, for a failure to pay withholding tax under section 6651(a)(2); and $8,730, $9,000, and $9,000 for 2003, 2004, and 2005, respectively, for failure to deposit withholding tax under section 6656.  Respondent has conceded all of the above additions to tax related to the unreported dividends.  Respondent determined that petitioner failed to withhold a tax of 30% on constructive dividends paid to Mr. Parker.  On February 25, 2010, petitioner timely filed the petition in docket No. 5020-10.

A trial was held in Miami, Florida, in January 2011.

**[\*30]**                                   OPINION

I.      Burden of Proof

As a general rule the taxpayer bears the burden of proving that the Commissioner's determinations are erroneous.  Rule 142(a)(1);  Welch v. Helvering, 290 U.S. 111, 115 (1933).

II.     Step Transaction Doctrine

Respondent claims that petitioner should be denied the capital loss deduction claimed on its 2004 Federal income tax return under the step transaction doctrine. Respondent argues that Vilanova always intended to sell the Tele2000 shares to Telefonica and that it simply interjected petitioner into the transaction to obtain a U.S. Federal income tax benefit.  Petitioner claims that each step in its transaction had independent significance and a business purpose.

"Under the step transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. taxes."  Del Commercial Props., Inc. v. Commissioner, 251 F.3d 210, 213-214 (D.C. Cir. 2001), aff'g T.C. Memo.1999-411; see also Superior Trading, LLC v. Commissioner, 137 T.C. 70, 88 (2011); Penrod v. Commissioner, 88 T.C. 1415, 1428-1430 (1987); Gordon v. Commissioner, 85 T.C. 309, 324 (1985).

[*31] Courts have applied three alternative tests in deciding whether the step transaction doctrine should be invoked in a particular situation; namely, (1) if at the time the first step was entered into, there was a binding commitment to undertake the later step (binding commitment test), (2) if separate steps constitute prearranged parts of a single transaction intended to reach an end result (end-result test), or (3) if separate steps are so interdependent that the legal relations created by one step would have been fruitless without a completion of the series of steps (interdependence test). See Penrod v. Commissioner, 88 T.C. at 1428-1430. More than one test might be appropriate under any given set of circumstances; however, the circumstances need satisfy only one of the tests in order for the step transaction doctrine to apply. Associated Wholesale Grocers, Inc. v. United States, 927 F.2d 1517, 1527-1528 (10th Cir.1991) (finding end-result test inappropriate but applying the step transaction doctrine using the interdependence test). We now turn to the application of these three tests to the transaction involved herein.

A.    End-Result Test

We first consider application of the end-result test. The end-result test combines into a single transaction separate events that appear to be components of something undertaken to reach a particular result. Kornfeld v. Commissioner, 137 F.3d 1231, 1235 (10th Cir.1998), aff'g T.C. Memo.1996-472; Associated

[*32] Wholesale Grocers, Inc., 927 F.2d at 1523.  Under the end-result test, if we find that a series of closely related steps in a transaction is merely the means to reach a particular end result, we will not separate the steps but instead will treat them as a single transaction.  Superior Trading, LLC v. Commissioner, 137 T.C. at 88-89; see also King Enters., Inc. v. United States, 418 F.2d 511, 516 (Ct. Cl. 1969); Helvering v. Ala. Asphaltic Limestone Co., 315 U.S. 179 (1942); Morgan Mfg. Co. v. Commissioner, 124 F.2d 602 (4th Cir. 1941), aff'g 44 B.T.A. 691 (1941); Heintz v. Commissioner, 25 T.C. 132 (1955); Ericsson Screw Mach. Prods. Co. v. Commissioner, 14 T.C. 757 (1950).

The end-result test focuses upon the actual intent of the parties at the time of the transaction.  It is flexible and bases tax consequences on the substance of the transaction, not on the formalisms chosen by the participants.  "The intent we focus on under the end-result test is not whether the taxpayer intended to avoid taxes. * * * Instead, the end-result test focuses on whether the taxpayer intended to reach a particular result by structuring a series of transactions in a certain way."  True v. United States, 190 F.3d 1165, 1175 (10th Cir. 1999).

Under the end-result test, there is no independent tax recognition of the individual steps unless the taxpayer shows that at the time the parties engaged in the individual step, its result was the intended end result in and of itself.  Id.  If

**[*33]** this is not what was intended, then we collapse the series of steps and give tax consideration only to the intended end result.  Id.

That, from the outset, a sale of the Tele2000 shares was the end result intended by Mr. Parker and Vilanova is shown by several key pieces of evidence. Mr. Parker was actively trying to sell the Tele2000 shares on behalf of Vilanova before transferring the shares to petitioner.  Mr. Lacasa, Mr. Parker's attorney, testified that as early as 2001 Mr. Parker was trying to sell the Tele2000 shares. Mr. Parker engaged in negotiations with BellSouth in 2001 to sell BellSouth Peru BVI the Tele2000 shares for $2 per share.  The parties could not agree to terms, and the negotiations ended.  In 2002 BellSouth entered into negotiations with Telefonica to sell Telefonica BellSouth's Latin American operations, including Tele2000.  Mr. Parker was made aware of the negotiations and of Telefonica's desire to purchase 100% of the shares of stock of Tele2000.  Telefonica intended to delist Tele2000 from the Lima stock exchange and make it a private company, essentially making the Tele2000 shares worthless.  Mr. Parker, with this new-found knowledge, once again engaged BellSouth Peru BVI in negotiations to sell the Tele2000 shares at 35 cents per share.  BellSouth Peru BVI once again rejected Mr. Parker and Vilanova's offer.

[*34] In March 2004 BellSouth and Telefonica finalized the sale of BellSouth's Latin American operations, including Tele2000. Telefonica purchased BellSouth Peru BVI's interest in Tele2000 for approximately 1.5 cents per share. As part of the terms of the sale, BellSouth, agreed to indemnify Telefonica for any ongoing litigation relating to the Tele2000 shares. BellSouth also agreed that Telefonica would not have to pay more per share to Tele2000's minority shareholders than they paid to BellSouth Peru BVI. BellSouth contacted Mr. Parker and informed him of the terms of the sale. The sale essentially put a ceiling on the price of the Tele2000 shares.

Mr. Parker was informed on September 1, 2004, by his accountants that petitioner would owe income tax on approximately $7 million of long-term capital gain for 2004 from the sale of the partnership interests. His accountants informed him he could avoid payment of the tax on the sale of the partnership interests by transferring the Tele2000 shares to petitioner, thus allowing petitioner to use the long-term capital loss from the sale of the shares to Telefonica. At the time of the transfer of the Tele2000 shares to petitioner, a sale of the shares to Telefonica was a foregone conclusion. The parties had negotiated terms and several drafts of an agreement before petitioner's involvement in the sale. Mr. Hillman testified that

**[\*35]** he was unaware of petitioner's involvement in the sale of the Tele2000 shares until the very last minute, when petitioner was added to the final agreement. On December 16, 2004, BellSouth, Tele2000, Telefonica, Mr. Parker, Vicmar, Vilanova, and petitioner entered into the share transfer agreement. On December 23, 2004, Telefonica paid $195,418, minus fees, for the Tele2000 shares. The payment was made to Mr. Parker individually, not petitioner.

Consequently, under the end-result formulation of the step transaction doctrine, it is clear from the record that, from the start, the acquisition of the Tele2000 shares by petitioner and the subsequent sale to Telefonica were really steps of a single transaction intended to be taken for the purpose of reaching the ultimate result. Those steps constituted part of a prearranged plan to have Telefonica obtain the Tele2000 shares while having the capital loss shifted to petitioner. Had Telefonica acquired the shares directly from Vilanova, this shift in the capital loss would not have occurred, and petitioner would have been obligated to report a capital gain rather than a capital loss that it could carry back to prior years. Petitioner may not avoid this result by employing mere formalisms thinly disguised to mask its true intentions. See Brown v. United States, 329 F.3d 664, 672 (9th Cir. 2003) (courts have "readily ignored the role of the intermediary" where "a party acts as a 'mere conduit' of funds-a fleeting stop in a predetermined

[*36] voyage toward a particular result"). Hence under the end-result test petitioner's ownership of the Tele2000 shares must be ignored, with Telefonica being viewed as having acquired the shares from Vilanova.

Petitioner argues that there was a legitimate business purpose for transferring the shares to petitioner. Specifically, petitioner argues that it needed money to build a 4G cellular network in TeleCable and obtaining the Tele2000 shares would provide such funding. However, petitioner's argument does not account for the fact that TeleCable was not part of the GD Parker affiliated group. TeleCable was a Peruvian corporation, wholly owned by Vicmar, a Panamanian corporation. Moreover, there is no evidence in the record of a joint venture between petitioner and TeleCable or any agreement at all regarding the development of a 4G cellular network. In fact, Ms. Bruce testified that the expenses incurred in the development of the 4G cellular network were TeleCable's expenses and were categorized as such on the bank reconciliation reports created by Ms. Bruce.

Petitioner also argues that as an American company it was in a better position to maximize the value of the Tele2000 shares in the ongoing disputes with BellSouth and BellSouth Peru BVI. The value of the Tele2000 shares was

**[*37]** fixed by Telefonica. The identity of the seller of the Tele2000 shares was irrelevant to a determination of price.

Moreover, the existence of business purposes and economic effects relating to the individual steps in a complex series of transactions does not preclude application of the step transaction doctrine. True, 190 F.3d at 1176-1177.

> To ratify a step transaction that exalts form over substance merely because the taxpayer can either (1) articulate some business purpose allegedly motivating the indirect nature of the transaction or (2) point to an economic effect resulting from the series of steps, would frequently defeat the purpose of the substance over form principle. Events such as the actual payment of money, legal transfer of property, adjustment of company books, and execution of a contract all produce economic effects and accompany almost any business dealing. Thus, we do not rely on the occurrence of these events alone to determine whether the step transaction doctrine applies. Likewise, a taxpayer may proffer some non-tax business purpose for engaging in a series of transactional steps to accomplish a result he could have achieved by more direct means, but that business purpose by itself does not preclude application of the step transaction doctrine. * * *

Id. at 1177.

Under the end-result test, there is no independent tax recognition of the individual steps unless the taxpayer shows that at the time the parties engaged in the individual step, its result was the intended end result in and of itself. If this is not what was intended, then we collapse the series of steps and give tax consideration only to the intended end result. Transferring the Tele2000 shares to

**[\*38]** petitioner was never the end result. Even if we were to believe petitioner's business purpose, it in and of itself contemplates the sale of the Tele2000 shares as the end result, one which could be accomplished without the additional step. Petitioner's arguments do not disturb our application of the step transaction doctrine. The intermediate step is ignored, and petitioner is denied its claimed capital loss deduction from the sale of the Tele2000 shares in 2004 and consequently the carryback to 2003 and carryover to 2005.

B.    Binding Commitment Test and Interdependence Test

Having found the end-result test applicable, we need not discuss the application of the binding commitment and interdependence tests to the facts of these cases.

III.    Section 362(e)

Respondent alternatively argues that the transfer of the Tele2000 shares falls under section 362(e) and as a result petitioner's basis in the Tele2000 shares is $195,418, thus eliminating petitioner's 2004 capital loss, 2003 capital loss carryback, and 2005 capital loss carryover. Though both respondent and petitioner spent most of their briefs arguing when the transfer of the Tele2000 shares occurred and whether the transfer fell under section 362(e), we do not need to reach a

**[*39]** decision with respect to the section 362(e) issue, having found that no transfer occurred for purposes of Federal income tax law under the step transaction doctrine.

IV.     Whether Appeals Properly Sustained Respondent's Filing of the Notice of Federal Tax Lien

Section 6321 imposes a lien in favor of the United States upon all property and rights to property belonging to a person who is liable for Federal taxes and neglects or refuses to pay them after notice and demand for payment has been made. Section 6320(a) and (b) provides that a taxpayer shall be notified in writing by the Commissioner of the filing of a notice of Federal tax lien and provided an opportunity for an administrative hearing. A hearing under section 6320 is conducted in accordance with the procedural requirements of section 6330. Sec. 6320(c).

If a taxpayer requests a hearing in a lien case, the hearing is to be conducted by the Commissioner's Appeals Office. Sec. 6320(b)(1). At the hearing the Appeals officer must verify that the requirements of any applicable law or administrative procedure have been met. Secs. 6320(c), 6330(c)(1). The taxpayer may raise any relevant issue with regard to the Commissioner's intended collection activities, including challenges to the appropriateness of the proposed lien and collection alternatives. Sec. 6330(c)(2)(A). A taxpayer is expected to

 [*40] provide all relevant information requested by Appeals for its consideration of the facts and issues involved in the hearing, including financial statements. Secs. 301.6320-1(e)(1), 301.6330-1(e)(1), Proced. & Admin. Regs.  A taxpayer may raise challenges to the existence or amount of the underlying tax liability if the taxpayer did not receive a notice of deficiency or otherwise have an opportunity to dispute the tax.  Sec. 6330(c)(2)(B).

If a taxpayer's underlying liability is properly at issue, the Court reviews any determination regarding the underlying liability de novo.  Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). The Court will review all other determinations regarding the proposed collection for abuse of discretion.  Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. at 181-182.  Generally, we consider only arguments and issues the taxpayer raised at the collection hearing or otherwise brought to the attention of the Appeals Office.  Giamelli v. Commissioner, 129 T.C. 107, 112-113 (2007); Magana v. Commissioner, 118 T.C. 488, 493 (2002); see also sec. 301.6330- (f)(2), Q&A-F3, Proced. & Admin. Regs.

Petitioner argues that respondent's Appeals Office incorrectly sustained respondent's filing of a notice of Federal tax lien because it ignored the fact that petitioner's 2003 Federal income tax liability had been eliminated by a capital loss

[*41] carryback derived from the sale of the Tele2000 shares in 2004. Petitioner was entitled to dispute its self-assessed 2003 Federal income tax liability because it had not received a notice of deficiency or otherwise had an opportunity to dispute the tax. See Montgomery v. Commissioner, 122 T.C. 1, 10 (2004). Having conducted a de novo review of petitioner's argument above, we find that petitioner is barred by the step transaction doctrine from claiming a capital loss for 2004 from the sale of the Tele2000 shares and a resulting capital loss carryback for 2003. Therefore, there is no capital loss carryback to offset petitioner's 2003 Federal income tax liability. Accordingly, we find that respondent's Appeals Office's decision to ignore petitioner's capital loss carryback was not arbitrary and capricious, and therefore respondent's Appeals Office correctly sustained the notice of Federal tax lien.

V.    Installment Sale of Partnership Interests

GDP sold its partnership interests for $10,811,958, receiving $7 million in cash.[11] GDP reported $10,811,958 of income on its 2003 and 2004 Federal income tax returns. One million dollars of the sale proceeds was paid to GDP in 2003, and the remaining $6 million was paid to GDP in 2004. Petitioner treated the sale as an installment sale and reported a capital gain of $3,089,131 in 2003

_____

[11]See supra note 4.

**[*42]** and a capital gain of $7,722,827 in 2004. The capital gain of $3,089,131 did not include the $1 million GDP received in 2003. Respondent argues that petitioner should have reported the $1 million received in 2003 as long-term capital gain for 2003 and thus understated its long-term capital gain for taxable year 2003 by $1 million. We agree.

Mr. Parker has taken inconsistent positions regarding the receipt of this $1 million. He admits that the $1 million was part of the proceeds from the sale of the partnership interests but claims the $1 million was a loan, telling his accountants to treat the $1 million as a loan. Petitioner has failed to provide any evidence supporting the existence of a loan. Therefore, we find that the $1 million GDP received in 2003 was not a loan, but rather payment in part for the sale of the partnership interests. Thus, the $1 million was part of the installment sale and should be treated as long-term capital gain on petitioner's 2003 Federal income tax return. Because petitioner has to report the $1 million on its 2003 return, petitioner may reduce its long-term capital gain on its 2004 return by $1 million.

VI.     Repair and Maintenance Expenses and Depreciation

Deductions are a matter of legislative grace, and the taxpayer must prove he or she is entitled to the deductions claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Section 162(a) provides that "There shall be

[*43] allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". The regulations specify that ordinary and necessary business expenses include "the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business". Sec. 1.162-1(a), Income Tax Regs. Taxpayers are required to maintain records sufficient to establish the amounts of allowable deductions and to enable the Commissioner to determine the correct tax liability. Sec. 6001; Shea v. Commissioner, 112 T.C. 183, 186 (1999). Section 167(a)(1) provides a depreciation deduction with respect to property used in a trade or business. Section 262 specifically disallows deductions for personal, living, and family expenses.

Respondent disallowed the following deductions related to the Valdemossa home, the yacht, and the Key Biscayne home:

| Deduction | 2003 | 2004 | 2005 |
|---|---|---|---|
| Repair and maintenance expenses | $123,242 | $50,000 | $9,623 |
| Depreciation | 104,650 | 85,610 | 84,089 |

Respondent argues that these expenses were not ordinary and necessary trade or business expenses and that even if they were, petitioner has failed to substantiate them. In order to determine whether these expenses were ordinary and necessary

**[*44]** trade or business expenses, we must first consider whether the ownership and maintenance of the Valdemossa home, the yacht, and the Key Biscayne home related primarily to personal or business purposes.

In general, where the acquisition and maintenance of property such as a yacht or a residence are primarily associated with profit-motivated purposes and personal use can be said to be distinctly secondary and incidental, a deduction for maintenance expenses and depreciation will be permitted. Int'l Artists, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970). Conversely, if the acquisition and maintenance are primarily motivated by personal considerations, the deductions must be disallowed. Such expenditures are not ordinary and necessary trade or business expenses and therefore fail to qualify as deductions under section 162. Id. Moreover, the disallowance of personal expenditures is expressly mandated by section 262.

The above principles apply to corporate as well as individual taxpayers. In the former case, since the corporation cannot itself make personal use of the property, the character of an expenditure is determined by reference to the benefit conferred upon shareholders, officers, or other individuals in control of corporate affairs. Int'l Trading Co. v. Commissioner, 275 F.2d 578 (7th Cir. 1960), aff'g T.C. Memo. 1958-104. As in the case of individual taxpayers, the personal use by

**[\*45]** a shareholder of corporate property renders expenditures therefor personal and results in taxable income to the shareholder. However, where substantial business and personal motives exist, allocation becomes necessary. Int'l Artists, Ltd. v. Commissioner, 55 T.C. at 105.

A.     Valdemossa Home

Respondent argues that petitioner did not use the Valdemossa home in its trade or business and therefore cannot deduct repair and maintenance expenses and depreciation. Petitioner argues that the Valdemossa home was purchased as an investment and therefore the costs associated with maintaining the home should be deductible. Petitioner was not in the business of buying and selling real estate. Rather, petitioner claims it was in the business of attempting to develop the infrastructure to bring a 4G cellular network through TeleCable to Peru. We do not see how the purchase of the Valdemossa home aided in, or was used in, petitioner's trade or business. Mr. Parker testified that he and his family used the Valdemossa home as a vacation home for one month a year during 2003, 2004, and 2005. There is no proof of business use in the record. The home was never rented to third parties or used to generate any profits. As a result, we agree with respondent that the Valdemossa home was not used in petitioner's trade or business and therefore all repair and maintenance expense and depreciation

**[\*46]** deductions claimed on petitioner's 2003, 2004, and 2005 Federal income tax returns associated with that home are disallowed.

### B.    The Yacht

Much like the Valdemossa home, the yacht was used exclusively for personal purposes by Mr. Parker and his family.  Petitioner has failed to introduce any evidence indicating that the yacht was used in its trade or business or purchased with a profit motive.  Therefore, we hold that all repair and maintenance expenses and depreciation associated with the yacht and claimed on petitioner's 2003, 2004, and 2005 Federal income tax returns are disallowed.

### C.    Key Biscayne Home

Respondent argues that petitioner did not use the Key Biscayne home in its trade or business and therefore cannot deduct repair and maintenance expenses and depreciation associated with the Key Biscayne home.  Specifically, respondent argues that Mr. Parker and his family used the Key Biscayne home as a personal residence during 2003, 2004, and 2005.  Therefore, respondent argues that the expenses associated with the home were personal and nondeductible under section 262.

Mr. Parker and his family used the home as their residence while in Miami.  Lesli M. Loayza, Mr. Parker's daughter, resided at the Key Biscayne home

[*47] throughout 2003, 2004, and 2005 while she attended Florida International University.  Jonathan S. Loayza, Mr. Parker's son, resided at the home for at least six months during 2003 and five months during 2005 while he attended high school in Miami.  Estralla Delgado Parker Vanini, Mr. Parker's daughter, resided at the home for six months in 2003 while she attended high school in Miami.  Mr. Parker and his wife used the home as their residence throughout 2003, 2004 and 2005 when they came to Miami.  Finally, Blanca A. Gonzalez, the family's personal maid, resided at the home throughout 2003, 2004, and 2005.  Mr. Parker and his family as well as Ms. Gonzalez were given full access to and use of the premises for personal purposes.  The only area of the home that Mr. Parker's family did not have use of was the office on the ground floor where Ms. Bruce worked and where petitioner's records and books were kept.

Expenses associated with the ground floor office are the only expenses which may be deducted under section 162.[12]  Petitioner may deduct repair and maintenance expenses and depreciation based on the percentage of the home used exclusively for the business, i.e. the square footage of the first floor office.

---

[12]Sec. 280A imposes additional rules on individuals and S corporations with respect to home office deductions.  Petitioner and Vanini are both C corporations; therefore sec. 280A is inapplicable in the cases at hand.

[*48] VII.   Other Deductions

Respondent disallowed the following other deductions from petitioner's

Federal income tax returns:

| Other deductions | 2003 | 2004 | 2005 |
|---|---|---|---|
| Bank charges | $783 | $1,506 | $14,675 |
| Contract labor | 49,445 | 44,927 | 40,225 |
| Miscellaneous expenses | 4,025 | --- | 58 |
| Office expenses | --- | 7,069 | 3,734 |
| Legal fees | 630,000 | --- | --- |
| Other rent and royalty expenses | 76,379 | 172,630 | 80,001 |
| Professional fees | | 242,806 | 166,025 |
| Other deductions from Conch Harbor | 279,355 | --- | --- |
| Telephone expenses | 25 | --- | --- |
| Travel expenses | 66,485 | | |
| Total other expenses | 1,106,497 | 468,938 | 304,718 |

If the trial record provides sufficient evidence that the taxpayer has incurred

a deductible expense but the taxpayer is unable to substantiate adequately the

precise amount of the deduction to which he or she is otherwise entitled, the Court

may estimate the amount of the deductible expense and allow the deduction to that

extent (Cohan rule).  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir.

1930); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985); Sanford v.

**[\*49]** Commissioner, 50 T.C. 823, 827-828 (1968), aff'd per curiam, 412 F.2d 201 (2d Cir. 1969). In these instances, the Court is permitted to make as close an approximation of the allowable expense as it can, bearing heavily against the taxpayer whose inexactitude is of his or her own making. Cohan v. Commissioner, 39 F.2d at 544. However, in order for the Court to estimate the amount of an expense, the Court must have some basis upon which an estimate may be made. Vanicek v. Commissioner, 85 T.C. at 742-743. Without such a basis, any allowance would amount to unguided largesse. Williams v. United States, 245 F.2d 559, 560-561 (5th Cir. 1957).

Petitioner has failed to substantiate most of its other expenses. Petitioner introduced a number of documents into evidence, including tax returns, work papers from its accountant, bank statements, and canceled checks. However, petitioner failed to explain to the Court, in brief or at trial, which of these documents and more specifically which of the thousands of pages before us substantiate its claimed expenses. On the basis of our analysis of the evidence, we find that petitioner is entitled to a contract labor deduction of only $15,000 for 2004. This expense was for payment to Ms. Bruce, petitioner's administrative assistant. The payments are substantiated by two canceled checks in the amounts of $9,000 on January 28 and $6,000 on September 3, 2004. All of petitioner's

**[\*50]** other deductions are either unsubstantiated or unrelated to petitioner's trade or business and thus are denied.

Petitioner failed to substantiate its bank charges; therefore, those deductions are denied. Petitioner failed to provide us a breakdown of its contract labor expense. As mentioned above, all we could determine was that Ms. Bruce's salary was included in this amount and only $15,000 for 2004 was substantiated. Petitioner failed to provide any detail with regard to its miscellaneous expenses, let alone substantiate those expenses. With regard to petitioner's office expenses, we have a reply to an information document request in which petitioner's accountants provide a breakdown of the office expense for 2004. However, a simple chart of expenses paid without documentation of the actual payments is not enough to substantiate the expenses. Therefore, petitioner is denied all deductions related to its office expenses.

Petitioner claimed legal fees paid to attorneys in relation to the arbitration and the shareholder derivative suit. These legal fees were ordinary and necessary trade or business expenses because petitioner was the owner of the Tele2000 shares at the time of the arbitration and shareholder derivative suits. However, petitioner has failed to substantiate most of the claimed legal fees. Though petitioner provided a ledger, we are unable to rely on the information in it without

[*51] further support.  The only support petitioner provided to the Court was two checks.  The first check was made out to Hughes, Hubbard & Reed for $50,000 on December 8, 2003.  The second check was made out to Lydia Quesada for $5,000 on December 4, 2003.  Without additional proof of payment of the claimed legal fees, we can award petitioner only a $55,000 deduction relating to the legal fees for taxable year 2003.

Petitioner also claimed deductions for other rent and royalty expenses.  Once again petitioner failed to provide a breakdown of this category of expenses and failed to provide the Court with evidence to substantiate any such expenses.  Petitioner claimed expense deductions for professional fees paid to independent contractors hired to assist petitioner with the 4G cellular network.  Similar to every other expense deduction petitioner claimed, the amounts reported on petitioner's tax returns do not correlate with any of the information introduced into evidence.  Regardless, we deny these deductions as petitioner has failed to prove it was in the trade or business of developing a 4G cellular network; thus any expenses associated with the development of such a network are not ordinary and necessary trade or business expenses.  Furthermore, it is unclear whether these independent contractors performed services for petitioner or TeleCable.  TeleCable is a Peruvian corporation independent of petitioner.  Mr. Parker as the indirect owner

[*52] of both TeleCable and petitioner may not simply pay the expenses of his Peruvian corporation with funds from his Florida corporation and then reap the benefits of a U.S. Federal income tax deduction.

Petitioner failed to provide a breakdown of the other deductions from Conch Harbor or provide any information regarding these deductions, let alone provide substantiating information. These deductions are denied. Finally petitioner's claimed telephone expenses and travel expense deductions are denied. Petitioner failed to introduce any evidence of when or where the travel took place or who was traveling.

VIII. Withholding Taxes on Constructive Dividends

Respondent contends that Mr. Parker and his family's rent-free use of the Key Biscayne and Valdemossa homes is a constructive dividend paid from Vanini to Mr. Parker through the chain of petitioner, Vilanova, and Vicmar.

Section 301 requires a taxpayer to include in gross income amounts received as dividends. Generally, a dividend is a distribution of property by a corporation to its shareholders out of its earnings and profits. Sec. 316(a). A dividend need not be formally declared or even intended by a corporation. Noble v. Commissioner, 368 F.2d 439, 442 (9th Cir.1966), aff'g T.C. Memo. 1965-84. When a shareholder or his family is permitted to use corporate property for

**[\*53]** personal purposes, the fair rental value of the property is includable in his or her income as a constructive dividend to the extent of the corporation's earnings and profits.  Commissioner v. Riss, 374 F.2d 161, 166-167, 170 (8th Cir. 1967), aff'g in part, rev'g in part T.C. Memo. 1964-190; Melvin v. Commissioner, 88 T.C. 63, 80-81 (1987), aff'd, 894 F.2d 1072 (9th Cir. 1990); Falsetti v. Commissioner, 85 T.C. 332, 356 (1985).  For a corporate benefit to be treated as a constructive dividend, the item must primarily benefit the taxpayer's personal interests as opposed to the business interests of the corporation.  Ireland v. United States, 621 F.2d 731 (5th Cir.1980); Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388 (9th Cir.1977), remanding T.C. Memo. 1973-223; Commissioner v. Riss, 374 F.2d 161.

We held above that Mr. Parker and his family's use of the Valdemossa home was a personal use of the home and that there was no corporate business purpose to the use.  Likewise we held that Mr. Parker and his family's use of the Key Biscayne home, except for the office on the ground floor, was primarily for personal use.  The only evidence petitioner offered establishing the use of the Key Biscayne home for a business purpose was Mr. Parker's self-serving testimony that he used the upper levels of the Key Biscayne home as a facility to host meetings and as an office to conduct petitioner's business.  We need not accept

[*54] Mr. Parker's self-serving statements if they are questionable, improbable, or unreasonable.  See Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).  Petitioner has failed to prove that Mr. Parker did not derive personal benefit from the use of the Valdemossa and Key Biscayne homes.

Respondent argues that the rent-free use of the Valdemossa and Key Biscayne homes is a distribution from Vanini to petitioner, from petitioner to Vilanova, and so on up the chain of corporations to Mr. Parker.  Petitioner contends that Mr. Parker paid rent for the use of the two homes and therefore there is no distribution for the rent-free use of the homes.  Petitioner reported rental income from the Key Biscayne home on its Federal income tax returns of $12,000, $30,000, and $30,000 for taxable years 2003, 2004, and 2005, respectively.  Petitioner also reported rental income from the Valdemossa home on its Federal income tax returns of $15,000, $24,000, and $24,000 for taxable years 2003, 2004, and 2005, respectively.  Petitioner argues that Mr. Parker paid this rent through the reduction of a loan he had made to petitioner.

We found no evidence of a loan to petitioner in the record, and petitioner submitted no evidence of a reduction of said loan as payment for rent. Additionally, Vanini, not petitioner, owned the Key Biscayne and Valdemossa

[*55] homes; thus rent should have been paid to Vanini, not petitioner. On the evidence in the record, we do not believe Mr. Parker ever intended to pay rent for his use of the two homes. Rental income was included in petitioner's Federal income tax returns only at the behest of Mr. Parker's accountants. We find that Mr. Parker's rent-free use of the home was a distribution from Vanini to petitioner, followed by a distribution from petitioner to Vilanova, and so on up the chain of corporations to Mr. Parker. Though the transaction took place in a single step (i.e., Mr. Parker directly gaining a personal benefit from Vanini), given the corporate structure, we find that the benefit and thus the distribution traveled up the chain of corporations.

In Tollefsen v. Commissioner, 52 T.C. 671 (1969), aff'd, 431 F.2d 511 (2d Cir. 1970), this Court determined that a distribution in a vertical chain of corporations was a constructive dividend. Mr. Tollefsen owned 100% of Tollefsen Brothers, Inc. (Tollefsen Bros.). Tollefsen Bros. in turn owned 100% of Tollefsen Manufacturing Corp. (Tollefsen Manufacturing). Tollefsen Manufacturing operated as a manufacturer of mineral shot and grit products. In 1960 Tollefsen Manufacturing sold its machinery, equipment, and other fixed assets, together with all its rights to manufacture mineral shot and grit, to a third party. After the sale, Tollefsen Manufacturing became inactive, holding only cash.

**[*56]** Mr. Tollefsen began making cash withdrawals from Tollefsen Manufacturing during 1960 after completion of the sale. The cash withdrawals were reflected on the books of Tollefsen Manufacturing as loan receivables, and Mr. Tollefsen issued Tollefsen Manufacturing interest-free promissory notes in exchange for the withdrawals. The Commissioner issued Mr. Tollefsen a notice of deficiency assessing tax for unreported dividend income in the amount of the withdrawals.

This Court found that the withdrawals were not loans but were in effect dividends from Tollefsen Bros. to Mr. Tollefsen. In so finding, the Court stated:

> It is clear that [Mr.] Tollefsen exercised complete control over Tollefsen Manufacturing through the ownership of all the stock in its parent company Tollefsen Bros. He was able to siphon off the assets of Tollefsen Manufacturing only because * * * [he] owned 100 percent of the stock of Tollefsen Bros. and the latter owned 100 percent of the stock of Tollefsen Manufacturing. In every real sense the funds in question came to him through Tollefsen Bros., notwithstanding that two steps (a transfer from Tollefsen Manufacturing to its parent, followed by a transfer from the parent to Tollefsen) were compressed into a single step, the transfer of funds directly to [Mr.] Tollefsen. We find, therefore, that the withdrawals in issue were in substance distributions to Tollefsen Bros. from its subsidiary Tollefsen Manufacturing, with a resulting constructive dividend to petitioners, the sole shareholders of Tollefsen Bros. * * *

Id. at 681.

[*57] Similarly, Mr. Parker exercised complete control over Vanini through his ownership of the intervening corporations, Vicmar, Vilanova, and petitioner. Mr. Parker and his family were able to use the two homes without paying rent because he owned 100% of Vicmar, which owned 100% of Vilanova, which owned 100% of petitioner, which owned 100% of Vanini. Much as in Tollefsen, four steps (transfers from (1) Vanini to petitioner, (2) petitioner to Vilanova, (3) Vilanova to Vicmar, and (4) Vicmar to Mr. Parker) were compressed into a single step, Mr. Parker and his family's rent-free use of Vanini's two homes. Therefore, we find that the rent-free use of the homes was in substance distributions to petitioner from Vanini, followed by distributions to Vilanova from petitioner, followed by distributions to Vicmar from Vilanova, and finally, distributions to Mr. Parker from Vicmar.

The amount of the distribution to Mr. Parker is the fair rental value for one month's use of the Valdemossa home in each of 2003, 2004, and 2005 and the fair rental value for the full-year use of the Key Biscayne home in 2003, 2004, and 2005, taking into account that the office on the ground floor was used solely for business purposes. Respondent concedes that the fair rental values for the Valdemossa home were $15,000, $24,000, and $24,000 for taxable years 2003,

[*58] 2004, and 2005, respectively. Both petitioner and respondent offered expert reports and testimony as to the fair rental value of the Key Biscayne home.

Petitioner submitted the testimony of Cecilia Samaja. Ms. Samaja is a real estate broker and sales associate in Florida. Ms. Samaja is not a licensed real estate appraiser. Having reviewed Ms. Samaja's report and her testimony, we do not find that her report is credible and therefore reject in whole her opinion.

Respondent relies on the expert report of Edward N. Ames[13] to determine the fair rental value of the Key Biscayne home in 2003, 2004, and 2005. Mr. Ames' report finds fair rental values of $21,000, $23,000, and $23,000 per month for 2003, 2004, and 2005, respectively. These rent amounts were for full use of the home including the office on the ground floor. Mr. Ames is a licensed appraiser. His expert report was thorough. He listed and described comparables and explained his methodology to the Court. We find the fair rental values determined by Mr. Ames to be fair measures of the rent that should have been charged for use of the Key Biscayne home during 2003, 2004, and 2005. However, these fair rental amounts did not take into account the exclusive

---

[13]Edward N. Ames was employed by respondent as a field specialist. He is licensed in Florida as a certified general real estate appraiser, a registered real estate broker, and a licensed mortgage broker. He also is an MAI member of the Appraisal Institute.

[*59] business use of the first floor office and therefore must be adjusted. For purposes of entering decisions in these cases, we will order the parties to prepare the requisite computation under Rule 155 to determine the fair rental values excluding the square footage of the first floor office.

In order to determine the amounts of the constructive dividends distributed from petitioner to Vilanova, we will order the parties to compute as part of their computations under Rule 155 petitioner's earnings and profits for 2003, 2004, and 2005 and to determine the amounts of the distributions outlined in this opinion that are treated as dividend income, return of basis, and long-term capital gain. See secs. 301 and 302.

Except as provided in section 881(c),[14] section 881(a) imposes a tax of 30% on, inter alia, dividends received from U.S. sources by a foreign corporation[15] to the extent the dividend received is not effectively connected with the conduct of a trade or business within the United States. Section 1442(a) generally requires the payor of interest subject to the tax imposed by section 881(a) to deduct and

---

[14]Sec. 881(c) is not relevant to these cases.

[15]A "foreign corporation" is a corporation that is not organized in the United States or under the law of the United States or of any State. Sec. 7701(a)(4) and (5). Vilanova is a corporation organized under the law of the Republic of Panama, and petitioner is a corporation organized under the law of Florida.

**[\*60]** withhold that tax at the source. If the payor does not do so, it becomes liable for such taxes under section 1461. Petitioner paid a constructive dividend to the extent of its earnings and profits emanating from Mr. Parker's use of the Valdemossa and Key Biscayne homes. Petitioner failed to withhold a tax equal to 30% of the dividends distributed to Vilanova in 2003, 2004, and 2005. We hold that petitioner, having failed to make the proper withholding under section 1442, is liable for the tax under section 1461 in accordance with the Rule 155 computation of earnings and profits.

IX.  Penalties

A.  Accuracy-Related Penalties in General

Respondent determined that petitioner is liable for accuracy-related penalties under section 6662 for 2003, 2004, and 2005. Section 6662(a) and (b)(1)-(3) and (e) imposes a 20% accuracy-related penalty upon any underpayment of tax resulting from: (1) negligence or disregard of the rules or regulations; (2) substantial understatement of income tax; or (3) substantial valuation misstatement.

An underpayment is due to a taxpayer's negligence where the taxpayer fails to make a reasonable attempt to comply with the provisions of the Code. Sec. 6662(c). An understatement is substantial if it exceeds the greater of 10% of the

[*61] tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). There is a substantial valuation misstatement where the value of any property (i.e. the basis in the Tele2000 shares) reported on a return is 150% or more of the amount determined to be the correct amount of the property's adjusted basis. Sec. 6662(e)(1)(A). Finally, the section 6662(a) penalty is increased to 40% when the underpayment of tax is the result of a "gross valuation misstatement". Sec. 6662(h). However, no penalty is imposed under section 6662 if there is reasonable cause for the underpayment of tax and the taxpayer has acted in good faith. Sec. 6664(c)(1).

### B. Burden of Production

The Commissioner bears the burden of production with respect to the taxpayer's liability for the section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c). Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position. Rule 142(a); Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

**[\*62]** C.     Penalty Determinations

1.     2003

For 2003 respondent adjusted petitioner's taxable income to include an additional $1 million of capital gain net income and disallowed $1,134,389 of repair and maintenance expenses, depreciation, and other deductions. The result, as set out in the notice of deficiency, was a deficiency in tax of $793,692. Respondent determined petitioner was liable for an accuracy-related penalty of $158,738 under section 6662(a) attributable to (1) negligence or disregard of rules or regulations under section 6662(b)(1); or (2) a substantial understatement of income tax under section 6662(b)(2).

2.     2004

For 2004 respondent adjusted petitioner's taxable income to include an additional $7,722,822 of capital gain net income and an additional $1 million of other income[16] and disallowed $604,548 of repair and maintenance expenses, depreciation, and other deductions. The result, as set out in the notice of deficiency, was a deficiency in tax of $2,888,443. Respondent determined petitioner was liable for an accuracy-related penalty of $52,536 under section

---

[16]This other income is a determination of cancellation of indebtedness income argued in the alternative by respondent. We have found there was no cancellation of indebtedness income for 2004.

**[\*63]** 6662(a) attributable to (1) negligence or disregard of rules or regulations under section 6662(b)(1); or (2) a substantial understatement of income tax under section 6662(b)(2). Respondent also determined that petitioner was liable for a $1,050,304 accuracy-related penalty relating to its capital gain net income on account of a gross valuation misstatement under section 6662(a), (b)(3), and (h).

### 3.     2005

For 2005 respondent adjusted petitioner's taxable income to include an additional $2,660,177 of capital gain net income and disallowed $398,430 of repair and maintenance expenses, depreciation, and other deductions. The result, as set out in the notice of deficiency, was a deficiency in tax of $839,462. Respondent determined that the underpayment of tax was attributable to a gross valuation misstatement under section 6662(a), (b)(3), and (h). Accordingly, respondent imposed an accuracy-related penalty of $335,785 for 2005. Respondent alternatively argues that if we do not find a gross valuation misstatement for 2005, petitioner is liable for an accuracy-related penalty under section 6662(a) of $164,220 attributable to (1) negligence or disregard of rules or regulations under section 6662(b)(1); or (2) a substantial understatement of income tax under section 6662(b)(2).

**[\*64]** D.  Negligence

Respondent argues that petitioner's underpayments of tax resulting from petitioner's claimed repair and maintenance expenses, depreciation, and other deductions for 2003, 2004, and 2005 are the result of petitioner's negligence and thus subject to the accuracy-related penalty under section 6662(a).  Respondent argues that he met his burden of production under section 7491(c) by showing that petitioner failed to keep adequate records to substantiate most of petitioner's repair and maintenance expenses, depreciation, and other deductions in accordance with the requirements of section 162.  We agree.

However, petitioner was able to substantiate some repair and maintenance expenses and depreciation associated with the Key Biscayne home, certain legal fees, and a small portion of salary it paid to Ms. Bruce.  Accordingly, we find that petitioner is subject to the accuracy-related penalties with respect to all claimed deductions except those few deductions mentioned above that were substantiated.

E.  Gross Valuation Misstatement

Section 6662(b)(3) imposes a 20% penalty on that portion of an underpayment which results from a substantial valuation misstatement.  There is a substantial valuation misstatement if the value of any property reported on the return is 150% or more of the amount determined to be the correct amount and the

**[\*65]** portion of the underpayment for the taxable year attributable to the substantial valuation misstatement exceeds $5,000.  Sec. 6662(e)(1)(A), (2).  Section 6662(h) increases the penalty to 40% in the case of a gross valuation misstatement.  There is a gross valuation misstatement if the value is 200% or more of the value determined to be the correct amount.  Sec. 6662(h)(2)(A)(i).  By its terms, the gross valuation misstatement penalty applies only when an underpayment is "attributable to" a valuation misstatement.  Sec. 6662(a), (b)(3), (e)(2), (h).

      1.  <u>Gustashaw v. Commissioner,</u>

Absent stipulation otherwise, these cases are appealable to the Court of Appeals for the Eleventh Circuit.  That Court of Appeals in <u>Gustashaw v. Commissioner</u>, 696 F.3d 1124 (11th Cir. 2012), <u>aff'g</u> T.C. Memo. 2011-195, recently joined the majority of Courts of Appeals by holding that the gross valuation misstatement penalty applies to underpayments attributable to overstated bases in property when a transaction is disregarded because it lacks economic substance.[17]

---

[17]<u>See</u> <u>Alpha I, L.P., ex rel. Sands v. United States</u>,  682 F.3d 1009, 1026-1031 (Fed. Cir. 2012); <u>Fid. Int'l Currency Advisor A Fund v. United States</u>, 661 F.3d 667, 671-675 (1st Cir. 2011); <u>Merino v. Commissioner</u>, 196 F.3d 147, 157-159 (3d Cir. 1999), <u>aff'g</u> T.C. Memo. 1997-385; <u>Zfass v. Commissioner</u>, 118 F.3d 184, 190-191 (4th Cir. 1997), <u>aff'g</u> T.C. Memo. 1996-167; <u>Illes v. Commissioner</u>, 982 F.2d 163, 167 (6th Cir. 1992), <u>aff'g</u> T.C. Memo. 1991-449; <u>Gilman v. Commissioner</u>, 933 F.2d 143, 151 (2d Cir. 1991), <u>aff'g</u> T.C. Memo. 1989-684;

(continued...)

[*66] In Gustashaw  the taxpayers entered into custom adjustable rate debt structure transactions  (CARDS transactions) to shelter income resulting from the exercise of stock options.  As part of the CARDS transaction, the taxpayers created an inflated fictional basis in property acquired in a foreign currency transaction which was later sold at a loss when taking into account the property's inflated basis.[18]

In Gustashaw the taxpayer conceded the deficiencies in income tax for all years at issue and challenged only the application of the valuation misstatement penalties.  The taxpayer argued that because the CARDS transaction lacked economic substance, there was no value or basis to misstate which would trigger the valuation misstatement penalties and the penalties should not apply as a matter of law, relying on Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), aff'g T.C. Memo. 1988-416,  and Todd v. Commissioner,  862 F.2d 540 (5th Cir. 1988), aff'g 89 T.C. 912 (1987).

---

[17](...continued)
Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), aff'g T.C. Memo. 1988-427.

[18]For a detailed description of the contours of a prototypical CARDS transaction, see Kerman v. Commissioner, T.C. Memo. 2011-54.

**[*67]** In affirming the Tax Court, the Court of Appeals for the Eleventh Circuit specifically rejected the reasoning of the Court of Appeals for the Fifth and Ninth Circuits, applied the gross valuation misstatement penalty, and held that the "rule rests upon the fact that the abusive tax shelter is built upon the basis misstatement, and the transaction's lack of economic substance is directly attributable to that misstatement." Gustashaw v. Commissioner, 696 F.3d at 1136.

### 2. The Cases at Bar

The cases at bar do not involve a sham transaction. Unlike the Gustashaw case, where no economic loss occurred, these cases involve Vicmar's actual payment of $12,746,730 for the Tele2000 shares, which were later sold for $195,418. Respondent has conceded that Vilanova had a basis of $12,746,730 in the Tele2000 shares. The sale of the Tele2000 shares resulted in actual economic loss.

In contrast to the transactions in Gustashaw, Vilanova's contribution of the Tele2000 shares to petitioner was not intertwined with any overvaluation misstatement. This Court would have disregarded the transfer of the Tele2000 shares under the step transaction doctrine regardless of the basis petitioner claimed in the Tele2000 shares. Stated differently, our determination of the applicability

**[\*68]** of the step transaction doctrine has nothing to do with any possible overvaluation or misstatement of petitioner's basis in the Tele2000 shares.

We have applied the step transaction doctrine to disregard Vilanova's contribution of the Tele2000 shares to petitioner for U.S. Federal income tax purposes. Consequently, for U.S. Federal income tax purposes, we have disallowed petitioner's claimed capital loss for 2004 and claimed capital loss carryover for 2005. Thus, we find that petitioner's underpayments of tax are not "attributable to" a valuation misstatement because the amount of basis petitioner claimed in the Tele2000 shares did not affect our application of the step transaction doctrine.

Petitioner's underpayment for 2005 was also attributable to the disallowance of deductions for repair and maintenance expenses, depreciation, and other deductions. Because the repair and maintenance expenses, depreciation, and other deductions claimed for 2005 did not depend on disputed valuation or basis statements, any underpayments of tax resulting from their disallowance cannot be based on gross valuation misstatements. See Jaroff v. Commissioner, T.C. Memo. 2004-276. However, the disallowed deductions for repair and maintenance expenses, depreciation, and other deductions are subject to the negligence penalty unless reasonable cause can be proved.

**[*69]** On the basis of the foregoing, we find that petitioner is not liable for the 40% accuracy-related penalty for a gross valuation misstatement for 2004 and 2005.

F.    Reasonable Cause

Section 6664(c)(1) provides that no penalty is imposed under section 6662 with respect to any portion of an underpayment if it is shown that there is reasonable cause for such portion and the taxpayer has acted in good faith. The taxpayer bears the burden of establishing that it acted with reasonable cause and in good faith. Calloway v. Commissioner, 691 F.3d 1315, 1334 (11th Cir. 2012), aff'g 135 T.C. 26 (2010). The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to determine its proper tax liability. Id. Circumstances indicating that a taxpayer acted with reasonable cause and in good faith include "an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id.

We find that petitioner has not acted with reasonable cause and in good faith with respect to the various trade or business expense deductions claimed.

[*70] Petitioner deducted business expenses which it has been unable to substantiate and has not attempted to substantiate. Petitioner caused its various U.S. entities to purchase assets for the personal use of its shareholder, Mr. Parker, and his family without any regard for the fact that corporate funds were being used. Petitioner then attempted to obtain a tax break from the use of these funds. Given the circumstances, we find that petitioner has not acted with reasonable cause and in good faith with respect to these deductions and is therefore liable for the accuracy-related penalty as to these deductions under section 6662(a) for 2003, 2004, and 2005, as described above.

However, we find that petitioner has acted with reasonable cause and in good faith with respect to the capital loss denied for 2004 and the capital loss carryback and carryover disallowed for 2003 and 2005, respectively. A taxpayer may meet his burden of establishing that he acted with reasonable cause and in good faith by showing that he reasonably relied in good faith on the advice of an independent professional, such as a tax adviser, lawyer, or accountant, as to the transaction's tax treatment. United States v. Boyle, 469 U.S. 241, 251 (1985); sec. 1.6664-4(c), Income Tax Regs.

The professional advice must meet several requirements. First, the taxpayer must show that the advice was based on "all pertinent facts and circumstances and

[*71] the law as it relates to those facts and circumstances." Sec. 1.6664-4(c)(i), Income Tax Regs. Second, the advice relied upon must not be based on any "unreasonable factual or legal assumptions," and must not "unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." Sec. 1.6664-4(c)(ii), Income Tax Regs. Third, the reasonableness of any reliance turns on the quality of the advice and whether, under the circumstances, it was objectively reasonable for the taxpayer to rely on that advice. See Gustashaw v. Commissioner, 696 F.3d at 1139; 106 Ltd. v. Commissioner, 684 F.3d 84, 90 (D.C. Cir. 2012), aff'g 136 T.C. 67 (2011).

Petitioner relied on the advice of its accountants and attorneys in preparing its 2003, 2004, and 2005 returns claiming the capital loss and the capital loss carryback and carryover and put forth an argument that Vilanova had indeed transferred the Tele2000 shares to petitioner in September 2004 and thus incurred a capital loss for 2004. Petitioner's accountants wrote a memorandum of law to petitioner in which it advised petitioner that Vilanova could transfer the Tele2000 shares to petitioner before the enactment of section 362(e) and be entitled to a carryover basis in the Tele2000 shares. Vilanova began taking steps to transfer the Tele2000 shares to petitioner before the enactment of section 362(e). Petitioner and its accountants and lawyers all believed that the Tele2000 shares

[*72] had been transferred before the enactment of section 362(e), thus allowing petitioner to claim a carryover basis in the Tele2000 shares.[19] We believe the advice petitioner received from its accountants at MBAF took into account all of the facts and circumstances of the transaction and the law as it related to those facts and circumstances. Further we do not believe that MBAF's advice was based on unreasonable factual or legal assumptions. Finally, we find it reasonable for petitioner to rely on the advice of MBAF in deducting the capital loss disallowed for 2004 and the capital loss carryback and carryforward disallowed for 2003 and 2005, respectively. As a result, we find that petitioner acted with reasonable cause and in good faith with respect to the 2004 capital loss, the 2003 capital loss carryback, and 2005 capital loss carryover. Therefore, petitioner is not liable for the accuracy-related penalty under section 6662(a) and (h) with respect to these losses for 2003, 2004, and 2005, as described above.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

---

[19]We note that we have not ruled on the issue of whether petitioner received the Tele2000 shares from Vilanova before the enactment of sec. 362(e) because the issue is irrelevant when the end-result step transaction doctrine is applied.

**[\*73]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.