T.C. Memo. 2013-220

UNITED STATES TAX COURT

MICHAEL P. CAHILL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6444-12.                          Filed September 18, 2013.

Michael P. Cahill, pro se.

<u>Debra Lynn Reale</u> and <u>John Aletta</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  Respondent determined a deficiency of $131,195, an addition to tax under section 6651(a)(1) of $30,653, and a penalty under section 6662(a) of $26,239 with respect to petitioner's Federal income tax for tax year 2008.

**[\*2]** Respondent later determined a revised deficiency of $120,318, a revised addition to tax under section 6651(a)(1) of $27,934, and a revised penalty under section 6662(a) of $24,064 with respect to petitioner's Federal income tax for tax year 2008.[1]

At trial respondent asserted an increase in petitioner's deficiency, claiming that he had received an additional $25,000 of income from American Steamship Owners, Shipowners Claims Bureau (Shipowners Claims Bureau).

Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

After concessions the issues for consideration are whether petitioner (1) received taxable income from Friemann Christie, L.L.C. (FC), also known as CFC Advisors, L.L.C. (CFC); (2) received additional taxable income from the Shipowners Claims Bureau; (3) received a taxable distribution from his section 401(k) plan (401(k) plan); (4) is entitled to deduct various expenses reported on his Schedule C, Profit or Loss from Business; (5) is entitled to additional itemized

---

[1]After issuing the notice of deficiency respondent reduced the amounts of the deficiency, addition to tax, and penalty on account of an adjustment to self-employment tax owed by petitioner.

[*3] deductions claimed on his Schedule A, Itemized Deductions; (6) is liable for the revised addition to tax under section 6651(a)(1); and (7) is liable for the revised penalty under section 6662(a).

## FINDINGS OF FACT

Some of the facts are stipulated and are so found. Petitioner resided in Connecticut when he filed the petition.

Petitioner is an executive in the insurance and reinsurance business. His work includes consulting and brokering. Petitioner holds a bachelor's degree in accounting and a master's degree in business administration.

During tax year 2008 petitioner worked for BMS Intermediaries, Inc. (BMS), which used Odyssey One Source, Inc. (Odyssey), as its payroll firm. Petitioner received wages of $356,333 from BMS/Odyssey as well as compensation of $5,000 directly from BMS. His contract for employment was with Odyssey.

During the tax year in issue petitioner also received a hardship distribution of $14,714 from a 401(k) plan provided by BMS/Odyssey and managed by Lincoln National Life Insurance Co. Petitioner requested the distribution because of tuition costs.

**[*4]**  In April 2008 BMS terminated petitioner's employment.  Later that month petitioner contacted Peter Christie, a principal at FC.  At that time FC's only principals were J. Bernard Friemann and Mr. Christie.  Soon after, petitioner began developing business with FC jointly.

On or about May 1, 2008, FC entered into a services, confidentiality, and noncompete agreement (Eagle agreement) with Eagle Ocean Agencies, Inc. (Eagle).  The Eagle agreement required petitioner to provide insurance consulting services for Eagle one day per week; in exchange Eagle would pay FC a flat fee of $125,000 from May 1 through December 1, 2008.  The Eagle agreement provided that Eagle would reimburse FC for travel costs and related expenses monthly. Expenses over $5,000 needed prior approval.

On May 14, 2008, petitioner received compensation income of $25,000 from the Shipowners Claims Bureau, a company affiliated with Eagle.  Petitioner provided consulting services to the Shipowners Claims Bureau.

On July 14, 2008, petitioner executed a memorandum of agreement with Mr. Christie.  In the memorandum of agreement FC agreed to provide petitioner with two drawdown facilities which he could use to supplement his income from FC.  Because FC agreed that petitioner should receive an average monthly income of $50,000, the memorandum of agreement allowed him to draw up to $50,000 per

[*5] month from the first facility.  The amount that petitioner could draw each month depended on the income FC allocated to him that month.  That amount, however, would not take into account the fees that FC received from Eagle pursuant to the Eagle agreement.  The total first drawdown facility available to petitioner was $150,000; once he reached that amount, he would be able to draw from the second drawdown facility.

Petitioner was required to repay the first drawdown facility out of future income allocated to him by FC.  Any outstanding balances would bear interest.  The memorandum of agreement stated that all draws would be treated as income earned by petitioner for tax purposes and FC would report any draws on a Schedule K-1, Partner's Share of Income, Deductions, Credits, etc., or a Form 1099-MISC, Miscellaneous Income.  In August 2008 FC changed its name to CFC.

On November 24, 2008, petitioner executed a revenue sharing and allocation agreement (revenue sharing agreement) with Mr. Friemann, Mr. Christie, and CFC.  The revenue sharing agreement formalized the memorandum of agreement.  Its goal was to provide "a means for the balancing of distributions between and among the Producers"-- i.e., petitioner, Mr. Friemann, and Mr. Christie--by "normaliz[ing] the flow" of petitioner's earned income with the two

[*6] drawdown facilities. Like the memorandum of agreement, the revenue sharing agreement provided petitioner with access to $50,000 per month from the first drawdown facility less the sum of the amount of his "earned income received from non-CFC production ('Outside Income')", among other things. The maximum amount petitioner could receive from the first drawdown facility was $150,000. Any draws on the facility would bear interest. The revenue sharing agreement also reiterated that the amounts CFC had received from Eagle with respect to the Eagle agreement would be excluded from the drawdown calculations.

The revenue sharing agreement further provided that CFC would report any money petitioner received from the drawdown facilities on a Form 1099-MISC or a Schedule K-1. The revenue sharing agreement provided that it would terminate on November 30, 2010.

On November 25, 2008, petitioner executed a guaranty connected with the revenue sharing agreement. The guaranty provided that if a balance remained in the second drawdown facility on November 30, 2010, petitioner would authorize CFC "to reallocate income" from him to Mr. Christie until the balance was eliminated. Mr. Christie was to fund the drawdown facilities.

**[*7]**  In tax year 2008 petitioner received the following payments from FC/CFC:

| Date of payment | Amount |
| --- | --- |
| 7/2/08 | $75,000 |
| 8/15/08 | 25,000 |
| 9/18/08 | 25,000 |
| 11/25/08 | 25,000 |
| 12/22/08 | 25,000 |
| Total | 175,000 |

Of these payments $125,000 represented the payments FC/CFC received from Eagle for services petitioner had rendered under the Eagle agreement.  On December 22, 2008, Eagle paid petitioner $20,000 directly.

On its 2008 Form 1065, U.S. Return of Partnership Income, CFC reported the $175,000 paid to petitioner as a guaranteed payment to a partner.  CFC also issued petitioner a Schedule K-1 reporting a guaranteed payment of $175,000.

In or around August 2009 the relationship between petitioner and CFC began to falter.  On September 4, 2009, Mr. Christie sent petitioner a draft operating agreement.  This agreement was never executed.

On April 22, 2010, petitioner and his wife filed their joint Federal income tax return for tax year 2008.  On their Schedule A petitioner and his wife claimed a deduction for the following miscellaneous itemized expenses:

| [*8] Expense | Amount |
|---|---|
| Unreimbursed employee expenses | $31,667 |
| Tax preparation fee | 750 |
| Other (see statement) | 500 |
| Total | 32,917 |

On his Schedule C petitioner claimed a deduction for the following business expenses for his consulting business:[2]

| Expense | Amount |
|---|---|
| Advertising | $3,035 |
| Car and truck | 10,593 |
| Depreciation | 1,600 |
| Insurance | 14,400 |
| Interest | 6,800 |
| Legal and professional services | 4,796 |
| Office | 29,243 |
| Rent or lease of vehicles, machinery, and equipment | 14,142 |
| Repairs and maintenance | 440 |

---

[2]Petitioner erroneously labeled the business on his Schedule C "Caron Croll Group".

| | |
|---|---|
| **[*9]** Supplies | 2,854 |
| Taxes and licenses | 1,980 |
| Travel | 15,095 |
| Meals and entertainment | 10,378 |
| Utilities | 13,985 |
| Other | 15,360 |
| Total | 144,701 |

During 2008 petitioner's wife received compensation income of $733 from the Caron Croll Group, Inc.

The notice of deficiency disallowed the expense deductions petitioner claimed on his Schedules A and C. The notice of deficiency also adjusted petitioner's income to reflect the payments he received from FC/CFC and the payment he received from his 401(k) plan.

OPINION

I.   Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and a taxpayer bears the burden of proving those determinations are erroneous. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). In order to shift the burden the taxpayer must comply with all substantiation and

[*10] recordkeeping requirements and cooperate with all reasonable requests by the Commissioner for witnesses, information, documents, meetings, and interviews, pursuant to section 7491(a)(2). See Higbee v. Commissioner, 116 T.C. 438, 441 (2001). Petitioner did not argue that the burden should shift, and he failed to introduce credible evidence that respondent's determinations are incorrect. Accordingly, the burden of proof remains with petitioner except with respect to the payment from the Shipowners Claims Bureau as explained below.

II.     Unreported Income

A.      Characterization of Payments Received From FC/CFC

Respondent contends that petitioner received $175,000 of taxable income from FC/CFC in the form of a guaranteed payment to a partner during tax year 2008. Respondent claims that petitioner erred when he failed to report the payment on his 2008 Federal income tax return.

Petitioner does not dispute that he received payments in the amounts determined by respondent for the tax year in issue. Petitioner, however, claims that he was not a partner of FC/CFC during the tax year in issue because he never

**[\*11]** signed CFC's amended and revised operating agreement and that the

payments were loans from the partnership to him rather than guaranteed

payments.[3]

    1.      Petitioner as a Partner of FC/CFC

Section 761(b) defines a partner as a member of a partnership.[4]  Notably,

"the definition of the term 'partnership' sheds significant light on the definition of

the related term 'partner' * * * .  Because a partnership can exist only in the

---

[3]Generally, we lack jurisdiction to redetermine the partnership items of a partnership if the partnership is subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648.  Blonien v. Commissioner, 118 T.C. 541, 551-552 (2002); see sec. 6221.  Partnership items include guaranteed payments, sec. 301.6231(a)(3)-1(a)(2), Proced. & Admin. Regs., and a taxpayer's status as a partner, McIntyre v. Commissioner, T.C. Memo. 2009-305.

    Neither FC nor CFC was a partnership subject to TEFRA because both qualified for the small partnership exception under sec. 6231(a)(1)(B).  FC and CFC had fewer than 10 partners, and all partners were individuals rather than "pass-thru partners" as defined by sec. 6231(a)(9).  See sec. 6231(a)(1)(B).  Therefore, we retain jurisdiction to determine whether petitioner received guaranteed payments from FC/CFC and whether he was a partner in FC/CFC.

    [4]Sec. 704(e)(1) defines a partner according to whether he or she "owns a capital interest in a partnership in which capital is a material income-producing factor".  The Court of Appeals for the Second Circuit, to which an appeal of this case would lie, see sec. 7482(b)(1)(A), has held that sec. 704(e) is limited to family partnerships, TIFD-IIIE, Inc. v. United States, 666 F.3d 836, 844 n.6 (2d Cir. 2012) ("The limited purpose is reflected in the title given to § 704(e)--'Family partnerships'--and to § 704(e)(1)--'Recognition of interest created by purchase or gift.'  It is further reflected in the other two subsections of § 704(e), which apply only to partnership interests created by gift.").

[*12] context of an economic relationship between one person and others, the questions as to whether a partnership exists and whether specific persons are partners are restatements of each other." 1 William S. McKee et al., Federal Taxation of Partnerships and Partners, para. 3.01[1], at 3-7 (4th ed. 2007); see also sec. 1.704-1(e)(1)(iii), Income Tax Regs.

A partnership generally exists when persons "join together their money, goods, labor, or skill for the purpose of carrying on a trade, profession, or business and when there is community of interest in the profits and losses." Commissioner v. Tower, 327 U.S. 280, 286 (1946); see also Dickerson v. Commissioner, T.C. Memo. 2012-60. Generally, "each partner contributes one or both of the ingredients of income--capital or services." Commission v. Culbertson, 337 U.S. 733, 740 (1949); see also Dickerson v. Commissioner, T.C. Memo. 2012-60.

To determine whether a partnership exists, we consider whether, in the light of all the facts, the parties intended to join together in good faith with a valid business purpose in the present conduct of an enterprise. Commissioner v. Culbertson, 337 U.S. at 742; Allum v. Commissioner, T.C. Memo. 2005-177, aff'd, 231 Fed. Appx. 550 (9th Cir. 2007). We weigh several objective factors in an attempt to discern their true intent. These factors include the agreement between the parties; the conduct of the parties in executing its provisions; the

[*13] parties' statements; the testimony of disinterested persons; the relationship of the parties; their respective abilities and capital contributions; the actual control of income; and the purposes for which the income is used. Commissioner v. Culbertson, 337 U.S. at 742. None of these factors alone is determinative. See Luna v. Commissioner, 42 T.C. 1067, 1077, 1078 (1964).

Even though petitioner did not sign CFC's operating agreement, both he and FC/CFC acted as though he was a partner of FC/CFC. Petitioner stated at trial that he contacted FC because he wanted to pool his resources and to develop business jointly with FC. When FC/CFC received a payment from Eagle pursuant to the Eagle agreement, FC/CFC would pay over the entire amount to petitioner immediately.

Petitioner entered into the memorandum of agreement and the revenue sharing agreement, both of which provided for the mechanism under which he would share in the profits of FC/CFC. Moreover, the memorandum of agreement and the revenue sharing agreement stated that FC/CFC would issue petitioner a Form 1099-MISC or a Schedule K-1 with respect to any money he received under either agreement. There is no indication in the record that petitioner objected to receiving a Schedule K-1 on the grounds that he was not a partner.

**[\*14]** Furthermore, the revenue sharing agreement refers to petitioner, Mr. Friemann, and Mr. Christie as "producers", thus placing him on the same footing with respect to revenue sharing as Messrs. Friemann and Christie. When asked whether the revenue sharing agreement was between CFC and partners, Mr. Friemann testified: "It was intended to be. * * * We certainly intended that * * * [petitioner] would be a partner in the business." Mr. Friemann also testified that "in 2008, when we were operating, it was always our intention that * * * [petitioner] would be a principal of the business."

Finally, after petitioner entered into the memorandum of agreement, FC changed its name from "Friemann Christie" to "CFC Advisors". Mr. Friemann testified that they chose the name CFC so that Mr. Christie could tell his clients that it stood for "Christie Friemann Cahill" and petitioner could tell his clients that it stood for "Cahill Friemann Christie". There is no indication that petitioner objected to the name change on the grounds that he was not a partner. Accordingly, we find that petitioner was a partner of CFC during the tax year in issue.

### 2. Whether the Payments Were Guaranteed Payments

Payments a partner receives from a partnership generally fall into one of three categories. First, a partner may receive payments representing distributions

[*15] of his or her distributive share of partnership income. <u>See</u> sec. 731. Second, a partner may receive payments in circumstances where he or she is not treated as a partner. Sec. 707(a). And third, a partner may receive guaranteed payments for services or use of capital that do not represent distributions of partnership income. Sec. 707(c). Specifically, section 707(c) provides:

> SEC. 707(c). Guaranteed Payments.--To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income) and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).

Whether a partner is acting in his or her capacity as a partner--rather than in his or her capacity as one who is not a member of the partnership--while providing services to his or her partnership is a factual determination. <u>See</u> <u>Falconer v. Commissioner</u>, 40 T.C. 1011, 1015 (1963). The regulations provide: "In all cases, the substance of the transaction will govern rather than its form." Sec. 1.707-1(a), Income Tax Regs. The inquiry under section 707(c) is whether the payments for petitioner's services were determined "'without regard to the income of the partnership.'" <u>Falconer v. Commissioner</u>, 40 T.C. at 1015, 1016 (quoting section 707(c)); <u>see also</u> sec. 1.707-1(c), Income Tax Regs.

**[*16]** We are satisfied that the facts of this case place the $125,000 of payments made to petitioner in accordance with the Eagle agreement within the ambit of the term "guaranteed payments" pursuant to section 707(c). The Eagle agreement provided that petitioner would provide insurance consulting services for Eagle one day per week, in exchange for which Eagle would pay FC/CFC a flat fee of $125,000 between May 1 and December 1, 2008. At trial Mr. Friemann testified that petitioner provided services under the Eagle agreement. Mr. Friemann stated that FC/CFC had hoped that in the long term he and Mr. Christie would also provide services to Eagle, but that only petitioner provided services to Eagle.

Mr. Friemann further testified that FC/CFC paid the $125,000 to petitioner immediately upon receipt. His testimony is consistent with FC/CFC's bank statements, which show that the day after FC/CFC received a payment from Eagle or one of Eagle's affiliates, petitioner withdrew an amount equal to the payment received. Petitioner does not dispute that he received this money.

Moreover, the memorandum of agreement and the revenue sharing agreement expressly stated that the payments pursuant to the Eagle agreement would not be considered draws from either drawdown facility. Mr. Friemann testified that they "wanted to be clear that this $125,000 would in no way reduce how much * * * [petitioner] could draw each month on the facility". Mr.

**[*17]** Friemann also testified that the $125,000 petitioner received was not subject to the drawdown facilities.

Petitioner thus contracted with FC/CFC to provide consulting services for a fixed fee which was not dependent upon the profits of the partnership. Therefore, the payments from Eagle were determined "without regard to the income of the partnership." Falconer v. Commissioner, 40 T.C. at 1016. Thus, $125,000 of the $175,000 of payments made to petitioner pursuant to the Eagle agreement was guaranteed payments. Even if petitioner had not been a partner in FC/CFC, these payments would be taxable to him as compensation for services rendered. See sec. 61(a)(1).

Petitioner claims that the remaining $50,000 of payments he received were not income because they were loans from the partnership to him and were subject to repayment. CFC classified these payments as guaranteed payments on its Form 1065. Petitioner claims in his pretrial memorandum that the remaining $50,000 of payments "may have been made under a Revenue Sharing agreement, which is effectively a draw-down facility, subject repayment and interest." Respondent agrees that the $50,000 of payments was made under the first drawdown facility.

Whether a transaction is a loan for Federal income tax purposes is a question of fact. The following factors are considered in determining whether a

**[*18]** loan is bona fide: (1) the existence of a sum certain; (2) the likelihood of repayment; (3) a definite date of repayment; and (4) the manner of repayment. Seay v. Commissioner, T.C. Memo. 1992-254; Mangham v. Commissioner, T.C. Memo. 1980-280. Rev. Rul. 73-301, 1973-2 C.B. 216, states that, for purposes of section 707(a), a loan by a partnership to a partner is considered to have been made only where the partner is under an unconditional obligation to repay a sum certain at a determinable date.

Petitioner's argument that the payments represent the repayment of loans is not supported by the record. Although payments under the first drawdown facility in theory accrued interest, neither the memorandum of agreement nor the revenue sharing agreement provided any definite date of repayment or a manner of repayment other than from future income allocated to petitioner. The revenue sharing agreement was merely set to terminate on November 30, 2010. Moreover, petitioner was required to execute a guaranty only with respect to the second drawdown facility. Therefore, the $50,000 of payments petitioner received pursuant to the first drawdown facility was not for repayment of loans.

Like the $125,000 of payments from the Eagle agreement, the payments from the drawdown facility were not dependent upon the profits of the partnership. The amount available to petitioner did not fluctuate with FC/CFC profits.

**[*19]** Moreover, the memorandum of agreement and the revenue sharing agreement expressly stated that any draws would be considered income to petitioner and would be reported on a Form 1099-MISC or a Schedule K-1. Thus, the remaining $50,000 of payments was also guaranteed payments.[5]

Accordingly, respondent correctly determined that petitioner received taxable income of $175,000 in the form of guaranteed payments from CFC in tax year 2008.

### B. Payment From Shipowners Claims Bureau

At trial respondent asserted an increase in petitioner's deficiency to reflect an additional payment of $25,000 that petitioner had received from the Shipowners Claims Bureau in tax year 2008. Respondent claims that petitioner erred when he failed to report this amount on his 2008 Federal income tax return. The Commissioner bears the burden of proof with respect to any increase of deficiency. Rule 142(a)(1). Therefore, respondent bears the burden of proof with respect to this issue.

---

[5]For purposes of sec. 731 (the extent of recognition of gain or loss in the case of a distribution from the partnership to the partner) advances or drawings of money against a partner's distributive share of income shall be treated as current distributions. Sec. 1.731-1(a)(1)(ii), Income Tax Regs. Although the $50,000 of payments were made under the first drawdown facility, there is no indication in the record that the payments were made against petitioner's distributive share of partnership income.

[*20] Respondent proffers (1) an invoice from petitioner to the Shipowners Claims Bureau requesting a fee of $25,000 that would be due on May 8, 2008, and (2) a transaction detail report from Deutsche Bank showing that petitioner received $25,000 from the Shipowners Claims Bureau on May 14, 2008. The treasurer of the Shipowners Claims Bureau also testified that the Shipowners Claims Bureau made the $25,000 payment to petitioner. Finally, petitioner admitted at trial that he received the $25,000 payment from the Shipowners Claims Bureau but failed to report it on his 2008 Federal income tax return. Petitioner has offered no evidence regarding this issue.

Accordingly, respondent correctly determined that petitioner received an additional taxable income of $25,000 from the Shipowners Claims Bureau in tax year 2008.

C.     Distribution From Petitioner's 401(k) Plan

Petitioner stipulated that he received a hardship distribution of $14,714 from his 401(k) plan in tax year 2008. Respondent claims that petitioner erred when he failed to report this payment on his 2008 Federal income tax return.

Generally, under section 72 amounts actually distributed from retirement accounts, such as 401(k) plans, are taxable income to the distributee in the taxable year in which they are distributed. Secs. 402(a), 72. If the taxpayer obtains a

[*21] distribution from a retirement account before he or she retires, only the amounts allocable to his or her investment in the contract are excludible from income. Sec. 72(e)(2)(B), (8)(A). Such amounts generally include contributions to a taxpayer's retirement account, but only if such contributions were includible in the taxpayer's income. Sec. 72(f). Petitioner has not established that any part of the distribution he received from his 401(k) plan represents contributions that were includible in his income or other investments he made in the contract.

Accordingly, respondent correctly determined that petitioner received taxable income of $14,714 from his 401(k) plan in tax year 2008.

III.    Expense Deductions

Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred in carrying on a trade or business. An ordinary expense is one that commonly or frequently occurs in the taxpayer's business, Deputy v. du Pont, 308 U.S. 488, 495 (1940), and a necessary expense is one that is appropriate and helpful in carrying on the taxpayer's business, Welch v. Helvering, 290 U.S. at 113. The expense must directly connect with or pertain to the taxpayer's business. Sec. 1.162-1(a), Income Tax Regs. A taxpayer may not deduct a personal, living, or family expense unless the Code expressly provides otherwise. Sec. 262(a).

[*22] Whether an expenditure is ordinary and necessary is generally a question of fact. Commissioner v. Heininger, 320 U.S. 467, 475 (1943). A taxpayer must show a bona fide business purpose for the expenditure; there must also be a proximate relationship between the expenditure and his or her business. Challenge Mfg. Co. v. Commissioner, 37 T.C. 650 (1962); see also Heinbockel v. Commissioner, T.C. Memo. 2013-125. In general, where an expense is primarily associated with profit-motivated purposes--and personal benefit can be said to be distinctly secondary and incidental--it may be deducted under section 162(a). Int'l Artists, Ltd. v. Commissioner, 55 T.C. 94, 104 (1970); see also G.D. Parker, Inc. v. Commissioner, T.C. Memo. 2012-327. Conversely, if an expense is primarily motivated by personal considerations, no deduction for it will be allowed under section 162(a). Henry v. Commissioner, 36 T.C. 879, 884 (1961); see also G.D. Parker, Inc. v. Commissioner, T.C. Memo. 2012-327. A taxpayer's general statement that his or her expenses were incurred in pursuit of a trade or business is not sufficient to establish that the expenses had a reasonably direct relationship to any such trade or business. Ferrer v. Commissioner, 50 T.C. 177, 185 (1968), aff'd per curiam, 409 F.2d 1359 (2d Cir. 1969); see also Adams v. Commissioner, T.C. Memo. 2013-92.

**[*23]** Deductions are a matter of legislative grace, and a taxpayer must prove his or her entitlement to a deduction.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).  To that end, taxpayers are required to substantiate each claimed deduction by maintaining records sufficient to establish the amount of the deduction and to enable the Commissioner to determine the correct tax liability.  Sec. 6001; Higbee v. Commissioner, 116 T.C. at 440.

Certain expenses specified in section 274 are subject to strict substantiation rules.  To meet these strict substantiation rules, a taxpayer must substantiate by adequate records or by sufficient evidence corroborating the taxpayer's own statement (1) the amount, (2) the time and place of the travel or use, and (3) the business purpose.  Sec. 274(d).  To substantiate by adequate records, the taxpayer must provide (1) an account book, log, or similar record and (2) documentary evidence, which together are sufficient to establish each element of an expenditure.  Sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).  Documentary evidence includes receipts, paid bills, or similar evidence.  Sec. 1.274-5(c)(2)(iii), Income Tax Regs.  To substantiate by sufficient evidence corroborating the taxpayer's own statement, the taxpayer must establish each element by his or her own statement and by documentary evidence

[*24] or other direct evidence. Sec. 1.274-5T(c)(3)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985). To establish the business purpose of an expenditure, however, a taxpayer may corroborate his or her own statement with circumstantial evidence. Id.

A.   Petitioner's Schedule C Expenses

On his 2008 Federal income tax return petitioner reported the following expenses on his Schedule C, some of which respondent has conceded:

| Schedule C expenses | Amount claimed | Amount conceded | Amount disallowed |
|---|---|---|---|
| Travel | $15,095 | $13,112 | $1,983 |
| Meals and entertainment | 10,378 | 8,202 | 2,176 |
| Car and truck | 10,593 | 7,624 | 2,969 |
| Utilities | 13,985 | 6,866 | 7,119 |
| Office | 29,243 | 17,495 | 11,748 |
| Depreciation | 1,600 | 2,350 | (750) |
| Taxes and licenses | 1,980 | 2,807 | (827) |
| Legal | 4,796 | 5,425 | (629) |
| Advertising | 3,035 | 3,035 | -0- |
| Other | 15,360 | 1,796 | 13,564 |
| Interest | 6,800 | 5,998 | 802 |
| Insurance | 14,400 | 3,718 | 10,682 |

| [*25] Supplies | 2,854 | -0- | 2,854 |
|---|---|---|---|
| Maintenance and repairs | 440 | -0- | 440 |
| Vehicle lease | 14,142 | 14,086 | 56 |
| Total | 144,701 | 92,514 | 52,187 |

Respondent also has conceded that petitioner is entitled to an education credit of $1,600 for educational expenses incurred by his wife for the tax year in issue.

Petitioner claims he should be able to deduct the remaining expenses relating to: (1) travel, (2) meals and entertainment, (3) car and truck, (4) utilities, (5) office expenses, (6) other expenses, (7) interest, (8) insurance, (9) supplies, (10) maintenance and repairs, and (11) vehicle lease. Travel expenses, meals and entertainment expenses, car and truck expenses, and vehicle lease expenses are all subject to the strict substantiation rules of section 274(d). Secs. 274(d)(1), (2), (4), 280F(d)(4)(A)(i) and (ii).

To substantiate his expenses, petitioner offers American Express bank statements, which show his travel, restaurant, merchandise, super market, auto, fees and adjustments, and insurance expenses. Petitioner also offers typed or handwritten lists for each type of expense, which provide the month, name of vendor, amount, and a very general explanation for each item listed. These lists

**[*26]** appear to have been created by petitioner.  There is no indication when petitioner compiled these lists.  Petitioner did not testify specifically about any of the expenses.

The American Express bank statements and self-compiled lists petitioner provided for those expenses do not provide enough information for us to determine what he actually purchased with respect to those expenses and to what extent these purchases had a business purpose.

Petitioner has offered no receipts regarding his car and truck expenses, utility expenses, interest expenses, supply expenses, and maintenance and repair expenses.  The sparse number of receipts and invoices that petitioner does offer fail to provide enough information for us to determine to what extent these purchases had a business purpose.

Petitioner has failed to meet the strict substantiation requirements of section 274(d) with respect to the travel expenses, meals and entertainment expenses, car and truck expenses, and vehicle lease expenses.  Petitioner has also failed to meet the substantiation requirements with respect to the utility expenses, office expenses, other expenses, interest expenses, insurance expenses, supply expenses, and maintenance and repair expenses.  Petitioner is not entitled to deduct any of

[*27] these expenses in excess of the amounts respondent has already conceded, if at all, for tax year 2008.

B.    Petitioner's Schedule A Expenses

On his 2008 Federal income tax return, petitioner claimed a deduction for miscellaneous Schedule A expenses totaling $32,917, relating to unreimbursed employee expenses, tax preparation fees, and other expenses.  In the notice of deficiency respondent disallowed a deduction for $28,823 of petitioner's Schedule A expenses.  In particular, respondent disallowed a deduction for the following Schedule A expenses:  (1) vehicle expenses; (2) expenses for travel away from home; (3) business expenses; (4) expenses for meals and entertainment; (5) expenses relating to tax preparation; and (6) other expenses marked "see statement".

Petitioner claims he should be allowed to deduct these expenses, or, in the alternative, that he should be able to move these expenses to his Schedule C and deduct them there.

For his Schedule A vehicle expenses, travel expenses, and meals and entertainment expenses petitioner offers no evidence to support these claims beyond what he offers to substantiate the corresponding Schedule C expenses. Petitioner's evidence thus does not sufficiently indicate that the vehicle expenses,

[*28] travel expenses, and meals and entertainment expenses were ordinary and necessary unreimbursed employee expenses directly related to a trade or business during the tax year in issue.

For his Schedule A business expenses petitioner offers: (1) a list titled "Business Expenses"; (2) American Express bank statements showing his merchandise expenses; (3) an invoice from T-Mobile; (4) an unidentified statement showing charges for travel expenses and services; and (5) an American Express bank statement showing his travel expenses. Other than the T-Mobile invoice petitioner provided no receipts regarding his reported business expenses. It is impossible for us to determine what petitioner actually purchased from these vendors or to what extent the purchases had a business purpose. Likewise, it is impossible to determine to what extent the items purchased from T-Mobile had a business purpose.

For his Schedule A tax preparation expenses petitioner offers a bill from his accountant, which refers to the preparation of his 2008 Federal and State income tax returns. The bill, however, is dated October 22, 2008, more than two months before the close of petitioner's 2008 taxable year and more than a year before he filed his 2008 Federal tax return.

**[*29]** Petitioner offers no evidence to support his Schedule A other expenses marked "see statement".

Petitioner has failed to meet the strict substantiation requirements of section 274(d) with respect to the Schedule A vehicle expenses, travel expenses, and meals and entertainment expenses. Petitioner has likewise failed to meet the substantiation requirements with respect to the Schedule A business expenses, tax preparation expenses, and other expenses. Petitioner is not entitled to deduct any of these expenses on his Schedule A for tax year 2008 because he has failed to establish that he incurred these expenses.

Even if petitioner were to establish that he incurred the expenses reported on his Schedule A, petitioner would not be entitled to deduct those expenses on his Schedule C. A taxpayer may deduct unreimbursed employee expenses as an ordinary and necessary business expense under section 162. Lucas v. Commissioner, 79 T.C. 1, 7 (1982); see also Farias v. Commissioner, T.C. Memo. 2011-248. A taxpayer may engage in the trade or business of "being an employee". O'Malley v. Commissioner, 91 T.C. 352, 363-364 (1988). Unreimbursed employee expenses are classified as miscellaneous itemized deductions and are deductible only to the extent they exceed 2% of the taxpayer's adjusted gross income. See sec. 67; sec. 1.67-1T(a)(1)(i), (b), Temporary Income

[*30] Tax Regs., 53 Fed. Reg. 9875-9876 (Mar. 28, 1988). An employee may also deduct miscellaneous itemized deductions on Schedule A for expenses incurred while looking for a new job in the employee's current field of employment. See Primuth v. Commissioner, 54 T.C. 374, 378-379 (1970); see also Hughes v. Commissioner, T.C. Memo. 2008-249. These expenses likewise are deductible only to the extent they exceed 2% of the taxpayer's adjusted gross income. Sec. 1.67-1T(a)(1)(i), (b), Temporary Income Tax Regs., supra. Employee expenses, however, are not deductible to the extent that a taxpayer obtained or could have obtained reimbursement from his other employer. Lucas v. Commissioner, 79 T.C. at 7; Stolk v. Commissioner, 40 T.C. 345, 357 (1963), aff'd, 326 F.2d 760 (2d Cir. 1964).

Petitioner admitted at trial that the expenses he deducted on Schedule A were incurred before May 2008. Petitioner was employed by BMS until his termination in April 2008, and he testified at trial that he had a noncompete agreement with BMS. He did not begin working with FC/CFC until May 1, 2008. Therefore, if petitioner incurred any of these expenses, they were incurred before he began his consulting business with FC/CFC at a time when he was still employed by BMS, thereby making them employee business expenses which must be reported as a miscellaneous itemized deduction on Schedule A. Moreover, if

[*31] the expenses were incurred by petitioner for the purpose of finding new employment in the field of insurance consulting, they would be reportable, if at all, as miscellaneous expenses on Schedule A. Thus, even if petitioner had established that he incurred the expenses, they would be reportable as miscellaneous itemized deductions on Schedule A and would be limited to the amount exceeding 2% of his adjusted gross income.

Petitioner is not entitled to deduct any Schedule A amounts as additional Schedule C expenses for tax year 2008.

IV.     Addition to Tax and Penalty

Under section 7491(c) the Commissioner bears the burden of producing evidence with respect to the liability of the taxpayer for any addition to tax or penalty. See Rule 142(a); Higbee v. Commissioner, 116 T.C. at 446-447. Once the Commissioner meets this burden, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect. Higbee v. Commissioner, 116 T.C. at 446-447.

A.     Section 6651(a)(1) Addition to Tax

Respondent determined that petitioner is liable for an addition to tax pursuant to section 6651(a)(1) because he did not timely file his 2008 Federal income tax return. Section 6651(a)(1) provides for an addition to tax for failure to

**[*32]** timely file a Federal income tax return unless it is shown that such failure was due to reasonable cause and not willful neglect. See also United States v. Boyle, 469 U.S. 241, 245 (1985). A failure to file a timely Federal income tax return is due to reasonable cause if the taxpayer exercised ordinary business care and prudence but nevertheless was unable to file the return within the prescribed time. See sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioner filed his 2008 Federal income tax return on April 22, 2010. Respondent has shown that petitioner failed to timely file his Federal income tax return for 2008. Consequently, we conclude that respondent has satisfied the burden of production under section 7491(c); petitioner must come forward with evidence to prove he is not liable for the addition to tax.

Petitioner failed to introduce any evidence that he is not liable for the addition to tax or that his failure to timely file was due to reasonable cause and not willful neglect. Accordingly, petitioner is liable for the addition to tax pursuant to section 6651(a)(1).

B.     Section 6662(a) Accuracy-Related Penalty

Respondent determined that petitioner is also liable for the accuracy-related penalty pursuant to section 6662(a) for tax year 2008. Section 6662(a) imposes a 20% penalty on any underpayment attributable to, among other things, (1)

[*33] negligence or disregard of rules or regulations within the meaning of section 6662(b)(1), or (2) any substantial understatement of income tax within the meaning of section 6662(b)(2). Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is subject to the penalty on more than one of the grounds set out in section 6662(b). Sec. 1.6662-2(c), Income Tax Regs.

The phrase "substantial understatement of income tax" means an understatement that exceeds the greater of $5,000 or 10% of the income tax required to be shown on the tax return for the taxable year. Sec. 6662(d)(1)(A). Respondent determined that petitioner should have reported an income tax liability of $125,154 on his 2008 Federal income tax return. Respondent also determined that petitioner understated his income tax by $120,318 for the tax year in issue. Respondent has since conceded that petitioner is entitled to $92,514 of deductions on his Schedule C and a credit of $1,600 for educational expenses. This will result in a lesser deficiency that may or may not exceed the greater of $5,000 or 10% of the income tax required to be shown on the tax return.

Even if petitioner's understatement is not substantial, respondent claims that petitioner is liable for the section 6662(a) penalty due to negligence. Negligence includes any failure to make a reasonable attempt to comply with the provisions of

[*34] the internal revenue laws, to exercise due care, or to do what a reasonable and prudent person would do under the circumstances. Sec. 6662(c); Neely v. Commissioner, 85 T.C. 934, 947 (1985); sec. 1.6662-3(b)(1), Income Tax Regs. Negligence also includes any failure by a taxpayer to keep adequate books and records or to substantiate items properly. Sec. 1.6662-3(b)(1), Income Tax Regs.

Respondent has shown that petitioner failed to report as income payments totaling $175,000 that he received from FC/CFC, for which he received a Schedule K-1; a payment of $25,000 that he received from the Shipowners Claims Bureau; and a hardship distribution of $14,714 that he received from his 401(k) plan. Respondent has further shown that petitioner failed to produce any documentary evidence showing that the expenses he reported on his Schedules A and C were ordinary and necessary expenses connected to a trade or business or his job. Respondent thus has shown that petitioner acted negligently.

Petitioner therefore is liable for the accuracy-related penalty unless he can show he had reasonable cause for and acted in good faith regarding part of the underpayment. See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. For purposes of section 6664(c) a taxpayer may establish reasonable cause and good faith by showing reliance on professional advice. Sec. 1.6664-4(b)(1), Income Tax Regs. A taxpayer reasonably relied on professional advice if he or she proves

**[\*35]** the following by a preponderance of the evidence: (1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); see also Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

Petitioner failed to introduce any evidence that he relied on professional advice or otherwise had reasonable cause for and acted in good faith regarding part of the understatement.

Accordingly, petitioner is liable for the accuracy-related penalty under section 6662(a).

Any contentions we have not addressed are irrelevant, moot, or meritless. To reflect the foregoing,

Decision will be entered
under Rule 155.